**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

PATTON BOGGS LLP,

                        Plaintiff,

    v.

CHEVRON CORPORATION,

                       Defendant.

Civil Action No:

**COMPLAINT AND JURY DEMAND**

Plaintiff Patton Boggs LLP ("Patton Boggs"), for its Complaint against Defendant, Chevron Corporation ("Chevron"), alleges as follows:

**NATURE OF THE ACTION**

1.    For the past 18 years, a coalition of residents from various indigenous and farming communities located in the Amazon region of Ecuador (commonly referred to as "los Afectados" or, in English, the "Afectados") have litigated against Texaco, Inc.—and since 2001, against Texaco's successor, Chevron Corporation ("Chevron")—in an effort to hold the oil company accountable for the damage inflicted by its deliberately injurious oil extraction operations in the Ecuadorian Amazon basin between roughly 1964 and 1990.

2.    Plaintiff Patton Boggs has provided legal representation to the Afectados since 2010.

3.    The Afectados first brought their claims in 1993 in the Southern District of New York, the location of Texaco's then-headquarters. Texaco fought for the next eight years to dismiss the case on *forum non conveniens* grounds. Texaco argued that Ecuador was the appropriate venue for the litigation; it submitted numerous affidavits from Ecuadorian legal experts, including the company's own Ecuadorian counsel, intended to assure the district court

that Ecuador was a fair forum with an impartial and competent judiciary. By way of example, Texaco affiant José Marla Pérez-Arteta pledged that Ecuador has a "corruption-free history of litigation against multi-nationals and other oil companies in Ecuador. Ecuador's courts have adjudicated, and continue to adjudicate, many cases involving oil companies in an impartial and fair manner."

4.     In 2002, Texaco—at this point, referring to itself as "ChevronTexaco" after the merger with Chevron[1]—obtained its *forum non conveniens* dismissal, but only on the following conditions, among others: (a) ChevronTexaco promised that it would submit to jurisdiction in Ecuador; and (b) because ChevronTexaco had stripped its assets from Ecuador, thus depriving the Ecuadorian courts of the ability to effectuate any ruling against the company, ChevronTexaco promised that it would abide any judgment rendered by an Ecuadorian court, subject only to specified defenses to recognition and enforcement of any judgment.[2]

5.     In 2003, the case was re-filed as a "popular action" in the Provincial Court of Sucumbíos (hereinafter, the "Sucumbíos Trial Court") in the town of Lago Agrio, Ecuador, a town that once served as a hub of Texaco's Ecuadorian operations (the "Lago Agrio Litigation"). On February 14, 2011, after eight years of litigation in Ecuador, Judge Nicolas Zambrano of the Sucumbíos Trial Court rendered a judgment against Chevron in the form of a 188-page opinion.

_____

[1] *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 390 n.3 (2d. Cir. 2011) ("Chevron Corporation claims . . .that it is not bound by the promises made by its predecessors in interest Texaco and ChevronTexaco, Inc. However, in seeking affirmance of the district court's forum non conveniens dismissal, lawyers from ChevronTexaco appeared in this Court and reaffirmed the concessions that Texaco had made in order to secure dismissal of Plaintiffs' complaint. [. . .] In 2005, ChevronTexaco dropped the name 'Texaco' and reverted to its original name, Chevron Corporation. There is no indication in the record before us that shortening its name had any effect on ChevronTexaco's legal obligations. Chevron Corporation therefore remains accountable for the promises upon which we and the district court relied in dismissing Plaintiffs' action.").

[2] *See, generally, Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534 (S.D.N.Y. 2001), *aff'd Aguinda v. Texaco, Inc.*, 303 F.3d 470, 476 (2d Cir. 2002).

That opinion was based on a roughly 215,000-page trial record, which contained, among reams of other evidence, over 100 expert reports documenting the thousands of soil and water samples taken by both parties at more than 90 well sites and production stations scattered throughout the region in which Texaco historically operated in Ecuador — a swath of rainforest roughly the size of the State of Rhode Island.  Among hundreds of other findings and conclusions, the Sucumbíos Trial Court concluded that Texaco's "system was designed to discharge waste to the environment in a cost-effective way, but did not correctly address the risks of damages."

6.     Chevron immediately appealed the Sucumbíos Trial Court's ruling. Approximately one year later, on January 3, 2012, after both parties submitted hundreds of pages of briefing, a three-judge intermediate appellate panel (hereinafter, the "Sucumbíos Appellate Panel") affirmed Judge Zambrano's ruling in all relevant respects.  In its opinion, the appellate panel noted that Chevron's tactics throughout the eight-year litigation were "abusive" and "rarely seen in the annals of administration of justice in Ecuador."  On January 20, 2012, Chevron filed a petition for review of the decision by Ecuador's National Court of Justice, roughly akin to the United States Supreme Court.  That petition remains pending as of the filing of this Complaint.

7.     Fifteen months *before* the Sucumbíos Trial Court issued its judgment, in December 2010, Chevron commenced filing scores of collateral discovery proceedings under 28 U.S.C. § 1782, the "foreign discovery statute," in courts throughout the United States, to obtain evidence from American lawyers and consultants working on behalf of the Afectados, purportedly for use in the litigation pending in Ecuador.

8.     Chevron filed 20 § 1782 proceedings in 16 courts around the country between December 2009 and February 2011.  Although each proceeding was distinct, the basic premise of Chevron's  § 1782 campaign—deemed by the United States Court of Appeals for the Third

Circuit to be "unique in the annals of American history"[3]—was that attorneys for the Afectados were exploiting an allegedly corrupt and incompetent Ecuadorian judiciary.

9.     The passage of time has shown that Chevron used its § 1782 campaign, at least in substantial part, to shop for the most hospitable forum in which to launch a U.S.-based collateral attack on the Ecuadorian proceedings, and on the Ecuadorian judicial system as a whole.

10.     Most of the district courts to consider Chevron's § 1782 petitions granted Chevron the discovery it desired while maintaining a sense of comity vis à vis the Ecuadorian court—the forum that Chevron had itself demanded, vehemently, to be the arbiter of the merits of the underlying case.  By way of example, the District of Colorado granted Chevron discovery from one of the Afectados' environmental consultants "without intruding into the merits that are committed to the jurisdiction of the Ecuadorian trial court."[4]  In another of Chevron's § 1782 actions in the Middle District of District of Tennessee, the court opined: "Chevron had an opportunity to litigate this matter in the United States and strongly opposed jurisdiction in favor of litigating in the Ecuadorian courts.  While fraud on any court is a serious accusation that must be investigated, it is not within the power of this court to do so, any more than a court in Ecuador should be used to investigate fraud on this court . . . . This limited proceeding is quickly spiraling out of control."[5]

11.     Other courts also began to take express notice of the fact that Chevron's § 1782 discovery actions might be as much about punishing its litigation opponents as they are about any legitimate need for or entitlement to evidence.  On November 30, 2011, the United States

---

[3] *In re Application of Chevron Corp.*, 650 F.3d 276, 282 n.7 (3d Cir. 2011).

[4] *Chevron Corp. v. Stratus Consulting et al.*, 1:10-cv-00047-MSK-MEH, Dkt 262 at 9.

[5] *Chevron Corp. v. Mark Quarles*, No. 3:10-cv-00686, Dkt. 108 at 2-3 (M.D. Tenn. Sept. 21, 2010).

District Court for the District of Oregon concluded that Chevron's conduct in a § 1782 proceeding was "sanctionable under Rule 45(c)(1)." The court found that Chevron "did not take [ ] steps" to "'avoid imposing undue burden or expense'" on the respondent, opining: "*[I]t is a responsible conclusion that Chevron's subpoena . . . was, at least in part, meant to harass.*"[6]

12.     And in vacating a decision in favor of Chevron in one of its § 1782 proceedings, the Third Circuit recognized that Chevron appeared to be unfairly exploiting the many stark differences between Ecuadorian civil law and U.S. common law norms: "[T]he circumstances supporting [Chevron's] claim of fraud largely are allegations and allegations are not factual findings. . . .Though it is obvious that the Ecuadorian judicial system is different from that in the United States, those differences provide no basis for disregarding or disparaging that system."[7]

13.     One of Chevron's § 1782 courts, however, did not at all hesitate to condemn the Ecuadorian judiciary or to opine on the merits of the underlying case in Ecuador. It did so notwithstanding the narrow grant of jurisdiction afforded by § 1782, or the fact that Chevron, for obvious reasons, opened only the smallest and most selective of windows into the underlying Ecuadorian litigation in its papers supporting its § 1782 applications. The Hon. Lewis Kaplan of the United States District Court for the Southern District of New York, in the context of § 1782 proceedings pending before that court, concluded at a hearing on September 23, 2010 that the Ecuadorian litigation was "mud-wrestling, not bona fide litigation." Judge Kaplan expressed his suspicion that the 18-year environmental and human rights litigation was a "game," and the "the name of the game is . . . to persuade Chevron to come up with some money." Judge Kaplan informed the parties that he "got it from the beginning" that counsel for the Afectados were

---

[6] *Chevron Corp. v. Salazar et al.*, No. 11-0691 (D. Ore. Nov. 30, 2011) (emphasis added).

[7] *In re Application of Chevron Corp.*, 650 F.3d at 294.

"trying to become the next big thing in fixing the balance of payments deficit."  Even earlier, on April 30, 2010—months before even Chevron began to suggest openly that the Ecuadorian courts are worthy only of scorn—Judge Kaplan indicated that he would be more inclined to pay attention to the wishes of the foreign court supposedly being "aided" by the requested § 1782 discovery if that foreign court were one more worthy of his respect: "Believe me, if this were the High Court in London, you can be sure I'd wait."

14.     Chevron had found its forum for an attack on the Ecuadorian litigation and the Ecuadorian judiciary.  On February 1, 2011—13 days before the Sucumbíos Trial Court even ruled—Chevron launched its attack in Judge Kaplan's court.  Chevron filed a 149-page complaint against the Afectados, their environmental consultants, and their legal representatives, asserting that those who aid the Afectados' cause are liable under the Racketeer Influenced and Corrupt Organizations Act ("RICO Act") for allegedly trying to "extort" money from Chevron through a combination of litigation, lobbying, and a public relations strategy.

15.     Chevron also sought declaratory and injunctive relief in its complaint.  Chevron asked Judge Kaplan for a declaration that the (then-indeterminate) Sucumbíos Trial Court judgment would not be entitled to recognition under New York's Recognition of Foreign Country Money Judgments Act (N.Y.C.P.L.R. 5301 *et seq.*), based on the alleged corruption and unfitness of the Ecuadorian judicial system, generally, and the Sucumbíos Trial Court, specifically.  In conjunction with its request for a declaration, Chevron also asked the court for an unprecedented injunction that would bar the Afectados and their counsel, including Patton Boggs, from taking any steps whatsoever towards seeking recognition and enforcement *in any court in the world*, of any Ecuadorian judgment that might issue.

16.     Based on Chevron's argument that irreparable harm was imminent if and when the Sucumbíos Trial Court entered judgment against it—at one hearing on the injunction, Chevron's counsel exclaimed that "[t]he Sword of Damocles is not over our heads, it's touching our foreheads"—Judge Kaplan allowed the Afectados less than two business days to respond to Chevron's 149-page complaint, 70-page brief, nearly 7,000 pages of affidavits and exhibits, and hours of video footage, and to explain why a temporary restraining order ("TRO") should not issue.[8]

17.     On February 8, 2010, the court granted Chevron its TRO, which prohibited the Afectados as well as their "officers, agents, servants, employees and attorneys in active concert or participation" with them, including Patton Boggs, from "funding, commencing, prosecuting, advancing in any way, or receiving benefit from, directly or indirectly, any action or proceeding for recognition or enforcement of any judgment entered against Chevron . . . or for prejudgment seizure or attachment of assets based on any such judgment."[9]

18.     Although Patton Boggs never appeared as counsel for the Afectados in any of the related proceedings in the Southern District of New York, on February 9, 2010, Chevron's counsel sent a letter to attorneys in Patton Boggs' Newark, New Jersey office, via e-mail and

---

[8] Chevron sued in New York each of the plaintiffs specifically named in the 2003 complaint filed with the Sucumbíos Trial Court, which is a "popular action" invoking the diffuse rights of the Afectados as a group.  Most of these named plaintiffs—citizens of the Ecuadorian Amazon with no ties to New York and who were purportedly served by way of Chevron e-mailing its RICO complaint to their Ecuadorian lawyer—were defaulted when their Ecuadorian counsel attempted to make a filing to protect their rights.  Two of these named Ecuadorian plaintiffs, however, did appear through counsel—under protest for lack of personal jurisdiction—to contest Chevron's allegations and to prevent an unfettered show-trial in the absence of any opposition.  For ease of reference, although only two Ecuadorian plaintiffs appeared in the New York action, we continue to refer to them here with the same moniker as the collective of which they are a part—the "Afectados."

[9] Annex 1 (*Chevron v. Donziger et al.*, 1:11-cv-00691-LAK, Dkt. 77, Order on Plaintiff's Motion For A Temporary Restraining Order (S.D.N.Y. Feb. 9, 2011)).

hand delivery, which stated that Chevron considered Patton Boggs "and anyone else in active concert or participation with" the Afectados now to be "on actual notice of, and bound by" the TRO.[10] Upon information and belief, Chevron's counsel delivered a similar letter on the same date to other lawyers, agents and consultants for the Afectados.

19.     After the TRO was entered, Judge Kaplan afforded the Afectados and their agents only three additional days to brief the issue of whether the TRO should become a worldwide preliminary injunction.

20.     In support of its reply papers, Chevron submitted roughly 100 additional exhibits and 12 declarations, including its first piece of "evidence" of any kind—a declaration from one of its own employees—purporting to demonstrate how Chevron might be irreparably harmed absent a preliminary injunction. Although Judge Kaplan had initially informed the parties to expect that an evidentiary hearing would be held in advance of any decision as to a preliminary injunction, Judge Kaplan changed his mind, and unexpectedly announced the closure of the record on February 18, 2011.

21.     Stripped of their ability to contest Chevron's allegations at an evidentiary hearing—particularly the reams of new evidence that Chevron dropped into the record on reply—the Afectados scrambled to marshal and submit several hundred pages of evidence of Chevron's "unclean hands" in connection with the Ecuadorian litigation a few days after the Judge Kaplan abruptly closed the record without warning. Judge Kaplan refused to consider this evidence — which included documentation concerning Chevron's involvement in a scheme to offer a bribe to an Ecuadorian judge.

---

[10] Annex 2 (Letter from Randy M. Mastro to Patton Boggs LLP, dated Feb. 9, 2011).

22.     On March 7, 2011, the district court granted Chevron a preliminary injunction virtually identical to the TRO (the "Preliminary Injunction"), other than the fact that the court expressly carved out from its prohibitions any enforcement activities in Ecuador itself—where it is widely known that Chevron has no assets.[11]

23.     On March 8, 2010, Chevron's counsel sent a letter to various attorneys in Patton Boggs' Newark, New Jersey office, via e-mail and hand delivery, which stated that Chevron considered Patton Boggs "and anyone else in active concert or participation with" the Afectados now to be "on actual notice of, and bound by" the Preliminary Injunction.[12]  Upon information and belief, Chevron's counsel delivered a similar letter on the same date to other lawyers, agents and consultants for the Afectados.

24.     The court required Chevron to post a bond in the amount of $21,800,000.00.  The required bond was posted on March 11, 2011.[13]

25.     The Afectados appealed the Preliminary Injunction to the United States Court of Appeals for the Second Circuit on March 24, 2011.

26.     On April 22, 2011, the Afectados moved before the Second Circuit for a partial stay of the Preliminary Injunction's most egregious terms—i.e. prohibiting any action that might be construed as preparing for the filing of an enforcement action—during the pendency of their appeal.  The Second Circuit held oral argument as to the Afectados' request for a partial stay on May 10, 2011.  At oral argument, the Second Circuit questioned whether Chevron would be

---

[11] Annex 3 (relevant excerpt from *Chevron v. Donziger et al.*, 1:11-cv-00691-LAK, Dkt. 181, Opinion (S.D.N.Y. Mar. 7, 2011).

[12] Annex 4 (Letter from Randy M. Mastro to James E. Tyrrell, Jr., dated Mar. 8, 2011).

[13] Annex 5 (*Chevron v. Donziger et al.*, 1:11-cv-00691-LAK, Dkt. 198, Preliminary Injunction Bond (S.D.N.Y Mar. 11, 2011)).

opposed a modification of the Preliminary Injunction that would allow the Afectados' counsel, including Patton Boggs, to perform preparatory work:

> HON. WINTER:         Do you, do you oppose . . . a stay in that part of the injunction that your opponent referred to, namely . . . against their preparing . . . actions to enforce the judgment that may or may not come later in Ecuador?
>
> MR. MASTRO:          We most definitely do, Your Honor [. . .] We oppose it for the following reasons . . . . [W]e know what their goal is . . . . We know from Patton Boggs themselves that the strategy is to take that Ecuadorian judgment and use it—[14]

27.     On May 12, the Second Circuit issued on order granting a partial stay of the Preliminary Injunction "insofar as the preliminary injunction restrain[ed] activities other than commencing, prosecuting, or receiving benefit from recognition, enforcement, or pre-judgment seizure or attachment proceedings."[15]

28.     The Second Circuit held oral argument on the merits of the Preliminary Injunction six months later, on September 16, 2011.  At oral argument, the Second Circuit panel questioned whether Chevron ever had any basis for seeking declaratory and injunctive relief—much less relief of purported *worldwide* application—under the auspices of New York's Recognition of Foreign Country Money Judgments Act.  Chevron's counsel could offer no such basis:

> HON. LYNCH:          Let me ask you a question first. About the New York judgment act, do you have any precedent of the New York court or the federal court applying New York law utilizing the New York judgment statute offensively as opposed to defensively to rule . . . that the New York law authorizes an action to prohibit the enforcement of a judgment [. . .] ?  Do you have any case that utilizes the statute that way?

---

[14] Annex 6 (*Chevron Corp. v. Camacho et al.,* 11-cv-1150(L), 11-cv-1264(CON), Dkt. 144-2, Transcript of May 10 Oral Argument Before the United States Court of Appeals for the Second Circuit) at 11-12.

[15] Annex 7 (*Chevron Corp. v. Camacho et al.,* 11-cv-1150(L), 11-cv-1264(CON), Dkt. 135, Order (2d Cir. May 12, 2011)).

> MR. MASTRO:      Your Honor, we have not cited such a case.
>
> HON. LYNCH:      You know one but you haven't cited it?  You have had some summer associate research this and that person has not come up with such a case; right?  Because there is no such case; right?  Am I right or wrong?
>
> MR. MASTRO:      You're correct . . . .[16]

29.     The Second Circuit also questioned whether it was plausible to believe—even if Chevron had any basis for a declaratory judgment action of some kind—that a federal district court applying the New York statute governing the enforcement of judgments really had the power to decide on behalf of the courts of *every country in the world* that the judgment is unenforceable.  Again, Chevron's answer was "no":

> HON. LYNCH:      [H]ow do you think the New York courts would react if a Venezuelan court attempted to enjoin a holder of a judgment from Russia and in New York by enjoining the plaintiffs and saying under Venezuelan law, this is not enforceable so do not go in to New York and attempt to enforce a judgment which might be enforceable under New York law because we find it unenforceable under Venezuelan law?  Do you think there's any chance that the New York courts would respect such a judgment or should respect such a judgment?
>
> MR. MASTRO:      No, Your Honor . . . .[17]

30.     The Second Circuit panel also was disturbed by Chevron's demand that U.S. courts disregard the Ecuadorian judicial process based on the allegations of a dissatisfied litigant who had demanded to be in Ecuador in the first place:

> HON WESLEY:      Don't we have some sense of comity to the legitimacy of the process?  Are we just to say to the people of Ecuador ["]you're all corrupt and your process doesn't matter to the

---

[16] Annex 8 (*Chevron Corp. v. Camacho et al.,* 11-cv-1150(L), 11-cv-1264(CON), Transcript of September 16, 2011 Oral Argument Before the United States Court of Appeals for the Second Circuit) at 58:11-59:15.

[17] *Id*. at 63:3-18.

> United States or a United States federal judge is not going to hear anything about the legitimacy of your process, a process by the way, which [Chevron] invoked?["][18]

31.     The Second Circuit was especially skeptical of Chevron's oft-repeated mantra that its allegations of fraud against the Ecuadorian judiciary and against the legal representatives of the Afectados are "undisputed" — particularly where that assertion might be accurate *only* insofar as Judge Kaplan gave the Afectados and their counsel, Steven Donziger, just a few days to respond to Chevron's tsunami of paper, which it had clearly spent months preparing:

| | |
|---|---|
| MR. MASTRO: | Judge Kaplan issued a status quo injunction preliminary injunction based on what was undisputed evidence before him of fraud in the procurement of the judgment and lack of impartiality in – |
| HON. WESLEY: | Well, that's not true because the timelines were pretty tight, weren't they? [ . . . ] You showed up with a thousand pages, didn't you, of exhibits and Donziger got how many days to respond? |
| MR. MASTRO: | Actually, Your Honor – |
| HON. WESLEY: | It's just a question.  I need you to respond. |
| MR. MASTRO: | [H]e had eight days to come into court on the TRO and then until the eleventh, that's eleven days, to submit additional papers.  He chose not to.  The [Afectados] did. [. . .] |
| HON. POOLER: | How can you say the evidence is uncontroverted?[19] |

32.     On September 19, 2011—the very next business day following oral argument— the Second Circuit issued a summary order vacating the Preliminary Injunction *in its entirety*, noting that a full opinion would follow in due course.[20]

---

[18] *Id*. at 52:16-53:3.

[19] *Id*. at 16:1-17:15

[20] Annex 9 (*Chevron Corp. v. Camacho et al.,* 11-cv-1150(L), 11-cv-1264(CON), Dkt. 598, Order (2d Cir. Sept. 19, 2011)).

33.     The Second Circuit issued its full opinion, 30 pages in length, four months later, on January 26, 2011.  The Second Circuit opined: "Nothing in the language, history, or purposes of the [New York Recognition of Foreign Country Money Judgments] Act suggests that it creates causes of action by which disappointed litigants in foreign cases can ask a New York court to restrain efforts to enforce those foreign judgments against them, or to preempt the courts of other countries from making their own decisions about the enforceability of such judgments."[21]    The Second Circuit also noted that the Preliminary Injunction risked "disrespecting the legal system not only of the country in which the judgment was issued, but also those of other countries, who are inherently assumed insufficiently trustworthy to recognize what is asserted to be the extreme incapacity of the legal system from which the judgment emanates.  The court presuming to issue such an injunction sets itself up as the definitive international arbiter of the fairness and integrity of the world's legal systems."[22]

34.     The TRO and Preliminary Injunction choked off the Afectados' ability to obtain funding that would allow them to reasonably contend with the upwards of *39 law firms* (including 15 of the American Lawyer Magazine's top 100 firms) that Chevron has admitted in court filings to deploying on this matter[23]—at a cost of untold millions of dollars per month—in jurisdictions throughout the world.

35.     The TRO and Preliminary Injunction incapacitated the Afectados' lawyers and consultants, including Patton Boggs, directly and indirectly, at a pivotal time in this eighteen-

---

[21] Annex 10 (*Chevron Corp. v. Camacho et al.,* 11-cv-1150(L), 11-cv-1264(CON), Dkt. 648, Opinion (2d Cir. Jan. 26, 2012)) at 21.

[22] *Id*. at 23-24.

[23] *See M. Goldhaber*, Ecuador Update: *One Door Shuts, Another Opens, and Chevron Lists Its Law Firms—All 39 of Them*, THE AMERICAN LAWYER, Jan. 24, 2011, *available at* http://amlawdaily.typepad.com/amlawdaily/2012/01/ecuador-update-another-door-shuts-another-door-opens-and-chevron-lists-its-law-firms-all-39-of-them.html.

year litigation.  The TRO and Preliminary Injunction i forced the Afectados and their counsel to sit on the sidelines and precluded them from taking measures to attach and restrain the movement and disposition of assets, to assure those assets would be available upon enforcement. Meanwhile, Chevron was able to lay the groundwork to resist enforcement in countries where the Afectados were likely to bring the Ecuadorian judgment.  The company also sold off otherwise attachable assets in certain of those countries.

36.      Owing to the TRO and Preliminary Injunction, the Afectados now find themselves holding a judgment with inadequate resources to enforce it.  Their current and former counsel and consultants, including Patton Boggs, find themselves with unpaid bills.  Providers of legal services and advice, like Patton Boggs, as well as vendors of legal support services under contract with the Afectados, wrongfully were enjoined from rendering the very services that they are in the business of providing.  Would-be contributors to the Afectados' cause were deterred by the lack of capital and the threat of a worldwide injunction that would prevent the Afectados from ever monetizing the Ecuadorian judgment — and Chevron has admitted that the judgment is the Afectados' only real asset.

37.      This is an action to redress the losses incurred particularly by Plaintiff Patton Boggs – by no means the only enjoined party to be damaged by way of Chevron's wrongful TRO and Preliminary Injunction.  That damage not only was *foreseeable* to Chevron, but was, in fact, Chevron's very *purpose* in seeking a frivolous injunction in the first place.

## JURISDICTION AND VENUE

38.      This Court has original federal question jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331 because this is an action on a bond, brought under 28 U.S.C. § 1352.

39.     The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the claims for collection of legal fees under New York state law, and for actual damages exceeding the bond that arose from Chevron's malicious prosecution of its claim for a frivolous injunction, as these claims are so related to the original federal claim on the bond that they form part of the same case or controversy under Article III of the United States Constitution.

40.     The Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different States.

41.     Venue is proper in this District under 28 U.S.C. §1391(b)(1) and (c), as Chevron is, in this District, "subject to personal jurisdiction at the time the action is commenced." Chevron has availed itself of this District Court with regard to multiple matters arising from its ongoing legal dispute with the Afectados.  In any event, Chevron conducts regular business in the State of New Jersey.

42.     Venue is also proper in this District under 28 U.S.C. §1391(b)(2) insofar as Plaintiff Patton Boggs has rendered the large majority of its services to the Afectados through the work of attorneys affiliated with the firm's office located at The Legal Center, One Riverfront Plaza, in Newark, New Jersey.  When the Preliminary Injunction was issued, Chevron's counsel specifically emailed several of these New Jersey-based attorneys to inform them that they were enjoined.  Chevron was at all relevant times aware that any damage inflicted on Patton Boggs by way of the Preliminary Injunction would occur in New Jersey.

## PARTIES

43.     Plaintiff Patton Boggs, a limited liability partnership, is engaged in the practice of law and public policy.  The firm maintains seven offices in the United States, one of which is located in Newark, New Jersey.

44.     Defendant Chevron is a multinational energy company, incorporated in the State of Delaware and headquartered in the State of California.

## CLAIMS FOR RELIEF

### COUNT ONE: EXECUTION OF FEDERAL BOND AGAINST CHEVRON

45.      All the preceding allegations are incorporated by reference.

46.     This claim arises under 28 U.S.C. § 1352 to collect a federal bond posted by Defendant Chevron.

47.     At all relevant times, Plaintiff has suffered damages from the erroneous and wrongful TRO and Preliminary Injunction, including, but not limited to, losses incurred by way of Plaintiff's inability to perform certain legal services for its clients.  Furthermore, by virtue of the wrongful Preliminary Injunction, Plaintiff was unable to collect fees for its services.

48.     The decision of the United States Court of Appeals for the Second Circuit vacating in its entirety the Preliminary Injunction erroneously issued by the Southern District of New York constitutes a final decision that triggers Chevron's liability on the federal bond and entitles Plaintiff to collect damages for the full amount of $21,800,000 on the bond.

### COUNT TWO: ATTORNEYS' FEES UNDER NEW YORK STATE LAW

49.     All the preceding allegations are incorporated by reference.

50.     The action from which the TRO and Preliminary Injunction issued was grounded in the court's purported diversity jurisdiction over Chevron's claims.  In its opinion granting the

Preliminary Injunction, the Southern District of New York observed: "The basis for subject matter jurisdiction over Chevron's claims against the [Afectados] is alienage jurisdiction under 28 U.S.C. 1332."

51.     The TRO and Preliminary Injunction was premised on a preliminary declaration that the Judgment of the Sucumbíos Trial Court would not likely be entitled to recognition under New York's Recognition of Foreign Country Money Judgments Act (N.Y.C.P.L.R. 5301 *et seq.*). The Second Circuit vacated the Preliminary Injunction, and dismissed the action from which it was issued, on the basis that the lower court had improperly applied New York state law.

52.     This supplemental claim for recovery of legal fees arises under New York state law, which allows the recovery of attorneys' fees incurred in resisting, and attempting to have lifted, an unlawful restraint.[24]

53.     Defendant Chevron is liable for legal fees generated by Patton Boggs in support of the Afectados' defense against Chevron's motion for a TRO and Preliminary Injunction, and for its legal fees generated in prosecuting the Afectados' appeal of the Preliminary Injunction to the Second Circuit.

### COUNT THREE: DAMAGES IN EXCESS OF THE BOND FOR MALICIOUS PROSECUTION

54.     All the preceding allegations are incorporated by reference.

55.     Chevron did not seek the TRO and Preliminary Injunction out of any real belief that it was so entitled under the law, or that such an injunction would be respected in an enforcement court outside the United States even on the off-chance that it could survive appellate

---

[24] *See, e.g., Globex Intern. Inc. v. Commercial Bank of Namibia Ltd*, 99 Civ. 4789, 1999 WL 1211827 (S.D.N.Y. Dec. 17, 1999); *Shu Yiu Louie v. David & Chiu Place Restaurant, Inc.*, 261 A.D.2d 150, 689 N.Y.S.2d 476 (1st Dep't 1999).

scrutiny.   As the Second Circuit explicitly recognized, the chance of any third-party nation respecting such an extra-territorial injunction issued by a U.S. court was non-existent.

56.     Instead, Chevron sought the TRO and Preliminary Injunction to incapacitate its litigation adversaries at a crucial moment in the case, by cutting off their ability to obtain funding and to otherwise prepare for its next phases.   And although the Preliminary Injunction was vacated, Chevron's main objective largely was achieved.

57.     Chevron's strategy has been to outspend and outlast the Afectados and those inclined to join their cause — to bleed them of resources until they can no longer effectively prosecute their claims.  Chevron has made no secret of that strategy.  The company once publicly threatened that it would "fight until hell freezes over and then fight it out on the ice."[25]  When the evidence began to build against Chevron in Ecuador, the company issued a press release promising the Afectados a "lifetime of appellate and collateral litigation" if they continued to pursue their claims.[26]  And notwithstanding its promise to the Second Circuit to abide by any judgment issued by the Ecuadorian courts, the company announced its predetermined strategy of relentless defiance several *years* before the Ecuadorian courts ever issued a judgment: "We're not paying and we're going to fight this for years *if not decades into the future*."[27]

58.     Chevron's bid for a frivolous TRO and Preliminary Injunction, designed to cripple its litigation adversary at arguably the most pivotal moment in this 18-year case, is part of the broader picture of Chevron's unprecedented abuse of both the United States and Ecuadorian

---

[25] *Chevron vs. Ecuadorean Activists*, THE GLOBAL POST, May 3, 2009, *available at* http://www.globalpost.com/dispatch/the-americas/090429/chevron-ecuador?page=0,2#.

[26] Chevron  Press Release: *Chevron Calls for Dismissal of Ecuador Lawsuit*, Oct. 8, 2007, *available at* http://www.chevron.com/news/press/release/?id=2007-10-08.

[27] *Chevron Expects to Fight Ecuador Lawsuit in U.S.*, WALL ST. J., July 20, 2009, *available at* http://finance.yahoo.com/news/pf_article_107364.html.

legal systems for the protracted period over which Chevron has been able to drag this litigation out.  That abusive pattern includes, among other conduct:

        a.      promising the Southern District of New York and the Second Circuit that it would acquiesce to the jurisdiction of the Ecuadorian courts in order to induce a dismissal of the *Aguinda* case, only to challenge jurisdiction in Ecuador as soon as the case was re-filed there.

        b.      working behind-the-scenes with Ecuadorian government officials to assure that the Aguinda case would be quashed once re-filed in Ecuador, at the same time it was assuring the Southern District of New York and the Second Circuit that the Afectados would receive a fair shake in Ecuador, notwithstanding the Afectados grave concerns to the contrary in light of ChevronTexaco's political clout in that country.

        c.      manipulating the evidentiary process in Ecuador – including disseminating to its environmental experts "Judicial Inspection Playbooks"—recently unearthed through § 1782 discovery—which instructed those experts to secretly visit well sites and locate areas within a site that exhibited the lowest levels of contamination.  Chevron's experts would then return to those predetermined areas during the official court-sanctioned inspections, and, of course, its samples would come up clean more often than samples taken by experts nominated by the Afectados.  When the Afectados' environmental experts filed a report with the Sucumbíos Trial Court criticizing Chevron for its disingenuous sampling practices, Chevron engaged three of its own experts to submit a rebuttal report in which they claimed to have reviewed Chevron's sampling protocol.  These experts filed their own report with the Sucumbíos Trial Court, in which they deemed groundless the Afectados' charge that Chevron's methods were designed to avoid finding contamination.  However, recent § 1782 discovery actions have unearthed evidence that Chevron induced these experts to commit a fraud on the Sucumbíos Trial Court, by

providing these experts with a doctored version of Chevron's actual sampling protocol – one that instructed field experts to make an honest determination as to "whether" a site was contaminated, as opposed to instructing the experts to demonstrate, by any means necessary, that the site was *not* contaminated. For example, Chevron's real protocol directed field experts to "[d]efine clean line around site to *show no widespread impacts*.  Locations for perimeter sampling should be chosen to *emphasize clean points* around pits when possible."   The protocol Chevron gave to the three experts tasked with evaluating the legitimacy of its field sampling methods stated, in place of the foregoing: "Access *potential migration* of petroleum constituents from the site and *absence/presence* of widespread impacts."

> d.      sponsoring a failed attempt to ensnare the presiding judge of the Sucumbíos Trial Court in a secretly-videotaped bribery entrapment scheme, carried out by one of its long-time contractors in Ecuador, Diego Borja.  Ironically, Borja himself was later secretly recorded boasting to a childhood friend that Chevron was conferring all manner of benefits on him for carrying out the judicial entrapment operation (including plucking him out of home in Ecuador less than 48 hours after the bribery scheme was completed, and housing him in a villa near the company's headquarters in San Ramon, California) — but doing it carefully to make the relationship appear legitimate: *"[E]verything they've given me they have to be able to give it . . . I mean, they have to be able to say, "Look Mr. Judge, we gave this to Mr. Borja because obviously there are the circumstances in which he lived in Ecuador.  I mean, he had a certain lifestyle. . . ." Bla, bla, bla, bla, you understand me right?[. . .] From the time they took me out of the country until I came here, how much have they spent on me? Oh! No idea, dude, but a lot."* Borja also boasted that Chevron had lied to the Sucumbíos Trial Court about the supposed independence of its sampling laboratories, and that he, Borja, was charged with setting up a

series of dummy companies to help Chevron conceal its control over the sampling process: "*Chevron always stayed, supposedly, independent, and sent the analysis to have them analyzed here, supposedly isn't that right? [. . .]        But I know that's not true. . . . . That's as much as I can tell you, my man! But you do understand me? [. . .] How shall I say it?  They did an analysis . . . it's like you . . . like I had done an analysis in my own house; something like that. [. . .] I have proof that they [Chevron's laboratories] were more than connected, they belonged to them.*"  Borja also stated that he possessed knowledge of Chevron's pervasive misconduct in connection with the Lago Agrio Litigation such that the company would face liability under the Foreign Corrupt Practices Act—and such that the Afectados would win their case instantly—if the information was ever made public: "*I have correspondence that talks about things you can't even imagine, dude.  I mean, things that [. . .]        Things that for them can . . . it's, I can't talk about them here, dude, because I'm afraid, but they're things that can make the Amazons win this just like that [snapping his fingers] . . . . I mean, what I have is conclusive evidence, photos of how they managed things internally . . . .*"

    e.  as the natural close of the Lago Agrio Litigation drew nearer, bombarding the Sucumbíos Trial Court with duplicative motions—sometimes over 15 in a single day—in an effort to exploit a rigid provision of the Ecuadorian Code of Civil Procedure that requires judges to address motions within a specified time period.  Chevron ultimately moved to recuse one presiding judge on the basis of that provision, not coincidentally, just as that judge had indicated his readiness to rule.  In so doing, Chevron bought itself several more months in which to more permanently scuttle the Lago Agrio Litigation.

f.      repeatedly threatening Judge Zambrano with criminal sanctions, including *imprisonment*, if he did not grant the company's motions to dismiss the case — just a few weeks after he took over the case following Chevron's forced recusal of the previous judge.

g.      trying to strong-arm the Ecuadorian government into squelching the Afectados' legal claims once it became apparent that Chevron could not win the case legitimately, on the evidence.  Chevron filed a baseless AAA Arbitration against the Republic of Ecuador, and then asked Ecuador's President to "intervene" to quash the "Sucumbíos trial" and, "in exchange, Texaco would be willing to drop the [AAA] arbitration in New York."  When that tactic failed with the dismissal of the arbitration, Chevron lobbied Congress and the U.S. Trade Representative to cancel Ecuador's trade preferences.   That scheme also failed – one Congresswoman from Chevron's home state of California remarked: "Instead of settling with the plaintiffs, embarking on clean-up efforts, or even seeking mediation, Chevron has engaged in a lobbying effort that *looks like little more than extortion* . . . . Apparently, if it can't get the outcome it wants from the Ecuadorian court system, Chevron will use the US government to deny trade benefits until Ecuador cries uncle."[28]

h.      lying yet again to the Second Circuit in 2010, when, in order to avoid dismissal of yet another arbitration claim Chevron had filed against the Republic of Ecuador (this time in the Hague), Chevron's counsel stood before the Second Circuit panel and promised that it would not use the arbitral panel as a vehicle to try and block the Afectados from securing a judgment in the Lago Agrio Litigation: "I want to—I do want to be super clear about this. We have not attempted, and we will not attempt, to ask the BIT tribunal to stop entry of a judgment."

---

[28] See *Members of Congress Urge USTR to Ignore Chevron Petition on Ecuador Legal Case,* Congresswoman Linda Sánchez, *available at* http://lindasanchez.house.gov/index.php?option=com_conten%20t&task=view&id=490&Itemid=32 (last visited February 13, 2012) (emphasis added).

On January 12, 2012, Chevron petitioned the BIT Arbitration Panel for an interim award requiring the "suspension of any certificate providing that the judgment is final" — absent which, according to Chevron, the Sucumbíos Trial Court's judgment is of no legal effect.

       i.     leading § 1782 courts to believe that it is improper for a party to meet *ex parte* with a court-appointed expert in Ecuador, just as it would generally be in the United States, in order to incite outrage at the contacts between the Afactados' legal team and a court-appointed expert in Ecuador, Richard Cabrera.  For example, in the Southern District of New York, Chevron alleged: "[The Afectados' counsel] and U.S.-based consultants he hired had improper *ex parte* contacts with both Cabrera and multiple members of his team."[29]  In the Eastern District of Pennsylvania and the District of New Mexico, Chevron alleged: "Cabrera's claims of independence were false.  Outtakes from *Crude* [a 2009 documentary film about the Lago Agrio Litigation] obtained by Chevron in another Section 1782 proceeding show Plaintiffs' representatives and consultants meeting *with Cabrera* to plan his expert report on March 3, 2007 . . . ."[30]  What Chevron did not tell any § 1782 court, however, is that its own technical team had (supposedly "improper") *ex parte* meetings with court-appointed experts.  Counsel for the Afectados learned of this fact only by the happenstance of a letter sent to the Sucumbíos Trial Court by an expert with whom Chevron had been working – and unfortunately, that letter was not filed with the court until October 29, 2010, after Chevron had already reaped the benefits of

---

[29] *In re Application of Chevron Corp.*, 10-mc-00002-LAK, Dkt. 11, Chevron's Ex Parte Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings (S.D.N.Y. Aug. 18, 2010).

[30] *Chevron Corp. v. Joseph C. Kohn, et al.*, 10-mc-00208-JD, Dkt. 1-1, Chevron's Memorandum of Law in Support of Application for an Order Pursuant to 28 U.S.C. § 1782 for Expedited Service and Enforcement of Subpoena for Use in Foreign Proceedings, (E.D. Pa Nov. 16, 2010);  *Chevron Corp. v. Richard Kamp*, 10-mc-00021-RB, Dkt. 2, Chevron's Memorandum of Points and Authorities in Support of Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings and Request for Expedited Briefing Schedule on any Objections Thereto (D.N.M. August 16, 2010).

its omission by plundering the Afectados privileged documents.  On that date, court-appointed expert Marcelo Muñoz Herrería wrote to the Sucumbíos Trial Court to complain of non-payment.  Muñoz represented to the Sucumbíos Trial Court that, in March of 2010, he had met with Chevron's technical consultant, Engineer Alfredo Guerrero, at a hotel in Coca, Ecuador at 9:00 p.m. for a "technical planning meeting" at which Engineer Guerrero apparently approved a plan for Dr. Muñoz.  Chevron has to date offered no explanation for why its technical team engaged in such allegedly "improper" contacts, save for claiming that its own contacts were of a supposedly lesser magnitude than what is alleged of the Afectados' legal team.

59.    In bad faith and with malice, Chevron set about to obtain its legally infirm TRO and Preliminary Injunction by again relying on the course of conduct it had followed for the previous eighteen years in both U.S. and Ecuadorian courts: Chevron resorted to misrepresentations and omissions of material facts designed to goad an already sympathetic district court into issuing an unlawful Preliminary Injunction.

60.    Chevron's material misrepresentations and omissions designed to induce the grant of the TRO and Preliminary Injunction  included, but were not limited to:

a.    claiming that the corruption and unfitness of the Ecuadorian judiciary became apparent upon what the company refers to as a "judicial purge" that occurred in Ecuador in 2004, but failing to inform the court that in July 2006—two years after the point that the Ecuadorian courts allegedly lost their integrity—Chevron argued in a brief submitted to the Northern District of California that the court should dismiss or stay a separate action brought by a group of Ecuadorian plaintiffs in deference to a prospective ruling from the Sucumbíos Trial Court.  In fact, in support of that argument in California, Chevron specifically cited the *Aguinda*

dismissal with approval, reconfirming that Ecuador continued to be the preferable forum to decide all environmental damage claims against it.

b.    arguing that the Afactados' counsel engaged in unlawful "collusion" with the Ecuadorian government insofar as counsel allegedly met with and lobbied government officials during the Lago Agrio Litigation, when—as revealed by "Wikileaks" cables released on or around August 30, 3011 (long after the Preliminary Injunction was already in place)— Chevron was itself, in 2008, "quietly explor[ing] with "senior GOE [Government of Ecuador] officials" ways that it could obtain "GOE support for ending the [Lago Agrio] case."[31]

c.    asserting, in its motion for a Preliminary Injunction, that the Afectados resorted to "corruption" to win their case because of the supposed "insurmountable legal and factual barriers to any legitimate judgment—such as . . . an *absence of scientific evidence of harm in the remediated sites* . . . ."[32], when, as discovered after the Preliminary Injunction was granted, the only way Chevron could muster *any* support for the notion that *any* scientific evidence absolved it was to instruct its experts to avoid finding contamination — and then to compound that manipulation by hiding its true sampling protocol from the very experts designated to evaluate it. (*See supra* ¶ 57(c).)

61.    Defendant Chevron is liable for any and all damages suffered by Patton Boggs as the result of Chevron's dishonest and malicious prosecution of the TRO and Preliminary Injunction, in excess of the bond posted by Chevron.

---

[31] *See* A. Klasfeld, *Leaked Cables Reveal Chevron Lobbying E*fforts, COURTHOUSE NEWS SERVICE, Sept. 22, 2011, available at http://www.courthousenews.com/2011/09/22/39994.htm.

[32] *Chevron Corp. v. Donziger et al*., 1:11-cv-00691-LAK, Dkt. 5, Chevron's Memorandum Of Law In Support Of Its Application By Order To Show Cause For A Temporary Restraining Order And Preliminary Injunction (S.D.N.Y. Feb. 5, 2011).

## PRAYER FOR RELIEF AND JURY DEMAND

62.     Plaintiff requests an Order and Judgment in its favor in *Count One* against Defendant Chevron, in the full amount of the bond posted by Chevron in connection with the wrongful and erroneous TRO and Preliminary Injunction.

63.     Plaintiff requests an Order and Judgment in its favor in *Count Two* against Defendant Chevron, for Plaintiff's hourly fees generated in connection with its clients' litigation of, and appeal from, the wrongful and erroneous Preliminary Injunction, in an amount to be determined at trial, plus legal interest.

64.     Plaintiff requests an Order and Judgment in its favor in *Count Three* against Defendant Chevron, for damages exceeding the bond posted by Chevron in an amount to be determined at trial, plus legal interest.

65.     Plaintiff requests an Order that Defendant Chevron take no steps to exonerate, dissolve, or otherwise impair the $21,800,000 bond that is the subject of this action, pending further order of this Court.

66.     Plaintiff requests an award of fees, costs, and any and all other relief that the Court may deem appropriate.

67.     Plaintiff demands a trial by jury on all issues so triable.

//

//

//

//

//

//

DATED:    Newark, New Jersey
February 15, 2012

PATTON BOGGS LLP

By:              
James E. Tyrrell, Jr.
PATTON BOGGS LLP
The Legal Center
One Riverfront Plaza, 6th Floor
Newark, New Jersey 07102
T: (973) 848-5600
F: (973) 848-5601

*Appearing Pro Se*