**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                    :
PATTON BOGGS LLP,                                                   :
                                                                    :
                    Plaintiff and                                   :
                    Counterdefendant,                               :
                                                                    :
                                                                    :     Case. No. 12-cv-9176 (LAK)
        v.                                                          :
                                                                    :
CHEVRON CORPORATION,                                               :
                                                                    :
                    Defendant and                                   :
                    Counterclaimant.                                :
                                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Defendant and Counterclaimant Chevron Corporation ("Chevron") hereby asserts its

Counterclaims against Plaintiff Patton Boggs LLP ("Patton Boggs"), and alleges as follows:

## <u>NATURE OF THE ACTION</u>

        1.      Chevron seeks redress from a fraudulent scheme perpetrated by Patton Boggs and

other American plaintiffs' attorneys by means of, among other things, a U.S. public pressure

campaign related to a corrupt litigation in Ecuador, which numerous federal courts have

recognized as being tainted by fraud.[1]  Patton Boggs has persisted in its efforts to direct, fund,

and expand the campaign, and to obstruct justice to prevent discovery of its role in the fraud.

---

[1]      *See, e.g., Chevron Corp. v. Donziger*, No. 1:11-cv-00691-LAK, Dkt. 905 at 28 (S.D.N.Y. Mar. 15,
2013) ("This record establishes probable cause to suspect" numerous fraudulent actions and obstruction of justice,
including ghostwriting of Cabrera Report, bribery of judges, and ghostwriting of the judgment itself); *Chevron
Corp. v. Champ*, No. 10-mc-27, 2010 WL 3418394 at *6 (W.D.N.C. Aug. 30, 2010) ("[W]hat has blatantly occurred
in this matter would in fact be considered fraud by any court."); *In re Chevron Corp.*, No. 10–MC–21 (J/LFG) (D.
N.M. Sept. 13, 2010) ("[D]iscussions trigger the crime-fraud exception, because they relate to corruption of the
judicial process, the preparation of fraudulent reports, the fabrication of evidence, and the preparation of the
purported expert reports by the attorneys and their consultants."); *In re Chevron Corp.*, No. 10–cv–1146–IEG
(WMC), 2010 WL 3584520 (S.D. Cal. Sept. 10, 2010) ("There is ample evidence in the record that the Ecuadorian

1

2.        Beginning as early as April 2010, Patton Boggs secretly became an important part of this scheme.  As described by Patton Boggs itself, the firm came "into this case charged with seeing that a judgment that would command international respect in Ecuador would be entered, and if it was entered, to develop an enforcement strategy."

3.        Among other improper acts, attorneys and experts purporting to represent the Lago Agrio Plaintiffs ("LAPs") surreptitiously ghostwrote the report of the supposedly neutral court expert Richard Cabrera, which they subsequently promoted to the U.S. media and to U.S. courts and other government entities as "independent."  In addition, the LAPs' attorneys bribed Cabrera using a "secret account" to which funds were wired from the United States.  And the LAPs or someone working with the LAPs who had access to their confidential documents that were not part of the court record drafted the Ecuadorian judgment itself.

4.        Patton Boggs acted improperly and dishonestly to obstruct discovery of the true facts about the Cabrera fraud and bribery scheme.

5.        Patton Boggs either knew in advance of the ghostwriting of the judgment against Chevron or must have become quickly aware of it once Chevron began to make the evidence known, and yet Patton Boggs continued to further the fraudulent scheme.

6.        The judgment that Patton Boggs was "charged with" getting entered was in fact a corrupt and illegitimate $18 billion dollar judgment against Chevron issued by an Ecuadorian court.  Despite the uncontradicted evidence to the contrary, Patton Boggs has falsely asserted in the U.S. that this judgment is legitimate and not the product of a corrupt process in which Patton Boggs and/or or its co-counsel colluded with the Ecuadorian court or court experts.

---

Plaintiffs secretly provided information to Mr. Cabrera, who was supposedly a neutral court-appointed expert, and colluded with Mr. Cabrera to make it look like the opinions were his own.").

7.     At all relevant times, Patton Boggs's tortious actions have been directed from the most senior levels of the firm.   James Tyrrell, the lead attorney on the engagement, is the managing partner of Patton Boggs's New York and New Jersey offices, the national chair of the firm's Toxic Tort and Product Liability practice groups, and is a member of the Firm's Executive Committee.   Patton Boggs's vexatious suits against Chevron in the District of Columbia, described below at paragraphs 25 through 37, were filed by Charles Talisman, the firm's General Counsel.   As described in further detail below at paragraph 66, Tyrrell acknowledged to the scheme's onetime funder, Burford, that despite his ethical concerns, there was enormous financial pressure at Patton Boggs to continue its prosecution of the Ecuadorian litigation against Chevron.

8.     Chevron seeks compensatory and punitive damages from Patton Boggs for: (1) fraud; (2) violations of N.Y. Judiciary Law § 487 in litigation in United States District Courts and Courts of Appeals in New York; and (3) Patton Boggs's malicious prosecution of its baseless lawsuits against Chevron.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1332(a), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different States.   This Court also has supplemental jurisdiction over these counterclaims under 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over Patton Boggs because it maintains an office and conducts regular business in the State of New York.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (c), because Patton Boggs is in this District, "subject to personal jurisdiction at the time the action is commenced."

## PARTIES

12.     Defendant and Counterclaimant Chevron is an energy company, incorporated in the State of Delaware and headquartered in the State of California.

13.     Plaintiff and Counterdefendant Patton Boggs is a limited liability partnership based on Washington, D.C., is engaged in the practice of law and public policy, and none of Patton Boggs's seven offices in the United States (including offices in Newark, New Jersey, and New York, New York) are in Delaware or California.

## FACTUAL BACKGROUND

### Patton Boggs Joined the Fraudulent Scheme Against Chevron in Early 2010, Giving Rise to a Conflict of Interest

14.     In 2008, as part of its effort to defend itself against the coordinated litigation and political activities involved in the fraudulent Ecuador litigation scheme, Chevron retained the Breaux Lott Leadership Group ("Breaux Lott Group"), a firm of lawyer-lobbyists headed by former Senator (and attorney) John Breaux and former Senator (and attorney) Trent Lott.

15.     Chevron retained the Breaux Lott Group again in 2009, and again in 2010, in each instance entering into a retention agreement that specifically provided that the Breaux Lott Group would represent Chevron in connection with the Ecuador matter and would keep all information it received as a result of that representation confidential.  Each contract provided that the Breaux Lott Group "shall not represent existing or new clients in any matter that may be adverse to Chevron, in which Chevron's interests may be adversely affected or in which the position advocated by [the Breaux Lott Group] conflicts with Chevron's position, without first obtaining written consent from [Chevron]."

16.     The contracts further provided that "Chevron's written consent, if any, to conflicting representation by [the Breaux Lott Group] shall not apply, and [the Breaux Lott

Group] agrees not to accept representation of other clients, in any instance where as a result of [the Breaux Lott Group's] representation of Chevron, it has obtained sensitive, proprietary, or other information of a nonpublic nature that, if known to any such other clients of [the Breaux Lott Group], could be used in any such matter by such client to the disadvantage of Chevron."  In other words, such a conflict would be so severe that even prior written consent could not alleviate it.

17.     Between 2008 and 2010, in the course of Breaux Lott Group attorneys' work with and representation of Chevron in connection with the Ecuadorian litigation, Chevron shared substantial amounts of confidential, attorney-client information with them, including information specifically concerning the Lago Agrio litigation and Chevron's strategy.

18.     Patton Boggs secretly joined the fraudulent scheme and commenced its involvement with the LAPs' attorneys in early 2010, when Chevron's discovery efforts against the U.S. experts who had ghostwritten Cabrera's report were threatening to expose the scheme.

19.     Shortly thereafter, in July 2010, Patton Boggs acquired the Breaux Lott Group. Following that acquisition, Patton Boggs's website and marketing materials touted the fact that Chevron was among the roster of clients represented by the Breaux Lott Group.

20.     On July 1, 2010, the Breaux Lott Group solicited a conflict waiver from Chevron, disclosing that "Patton Boggs personnel are registered lobbyists for the Government of Ecuador" but omitting any reference to Patton Boggs's involvement with the LAPs.  Neither Patton Boggs nor the Breaux Lott Group disclosed to Chevron that Patton Boggs was actively representing the LAPs in connection with the litigation in Ecuador and related proceedings in U.S. federal courts, adversely to Chevron in the same matter for which Chevron had retained the Breaux Lott Group.

**Patton Boggs Concealed and Lied about Its Involvement in the Fraudulent Scheme**

21.     Patton Boggs concealed its representation of the LAPs from at least April 2010 until November 2010, when the firm first entered an appearance in an appeal of one of Chevron's 28 U.S.C. § 1782 actions.  Patton Boggs lied to the court just days later about the duration of its representation, claiming that its involvement in the matter had begun the previous week and that the firm was still "getting up to speed."  But as early as of April 22, 2010, Patton Boggs partner Eric Westenberger had "instructed [LAP consultant Stratus Consulting, Inc.'s counsel] not to divulge his firm's involvement" in the various cases because Patton Boggs "hasn't yet entered an appearance."

22.     In a November 2010 oral argument before the Second Circuit, Patton Boggs partner James Tyrrell falsely claimed that Patton Boggs "only came into the case last Thursday," even though the firm had been secretly involved in the case for months and had directed legal strategy for the LAPs in the Southern District of New York.

23.     When Patton Boggs's appearance in the Second Circuit on behalf of the LAPs alerted Chevron to that firm's involvement in the same matter for which Chevron had retained the Breaux Lott Group, Chevron's counsel wrote to Patton Boggs's counsel on November 13, 2010, and expressed Chevron's concerns.  Chevron's counsel asked Patton Boggs for its position "regarding the apparent conflict of interest."  Chevron's letter stated that although "Chevron has grave concerns that [Patton Boggs's] appearance in this matter constitutes a conflict of interest that could result in disqualification," it was still "reviewing the matter with expert counsel" and "has not yet had an adequate opportunity to analyze the situation."

24.     Rather than provide any meaningful response to Chevron's legitimate concerns, Patton Boggs immediately filed a malicious lawsuit against Chevron.

**Patton Boggs Files Multiple Vexatious Suits in the District of Columbia**

25.     Patton Boggs sued Chevron in the United States District Court for the District of Columbia in November 2010.   The complaint sought a declaratory judgment that the representation of Chevron in the same matter by a lobbying group subsequently acquired by Patton Boggs "does not provide a basis for disqualifying Patton Boggs from representing the Ecuadorian Plaintiffs."   *Patton Boggs, LLP v. Chevron Corp.*, 791 F. Supp. 2d 13, 23 (D.D.C. 2011) ("*Patton Boggs I*").

26.     Patton Boggs's suit was not a good-faith attempt to seek a declaratory judgment to resolve a legitimate dispute; it was a malicious act in furtherance of the fraudulent scheme. Patton Boggs's participation in the fraudulent Ecuador litigation was unethical, and in violation of the firm's professional obligations, and its baseless lawsuit threatened Chevron that any objection to Patton Boggs's involvement would be met with public controversy and potential disclosure of the matters in which Breaux Lott had been providing confidential legal advice to Chevron.

27.     At the same time Patton Boggs was publicly touting its client relationship with Chevron for its own marketing purposes, Patton Boggs's complaint against Chevron contained numerous inflammatory and false claims maligning Chevron, its former client—statements that were irrelevant to the narrow conflict-of-interest issue ostensibly raised in Patton Boggs's declaratory judgment claim, but rather, calculated to further pressure Chevron to pay off Patton Boggs and the other perpetrators of the fraudulent scheme.

28.     Patton Boggs later sought leave to amend its complaint to add Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), a law firm representing Chevron, as a defendant and to include a new claim for tortious interference with contract, as well as two derivative tort claims.

29.     The new allegations in the proposed amended complaint:  (1) further smeared Chevron, its conduct, and its motives regarding the Ecuadorian litigation—the very engagement for which Chevron had hired the Breaux Lott Group; (2) falsely implied that the fraudulent Ecuadorian judgment was valid; and (3) again, were irrelevant to the legal claims that Patton Boggs had brought, but highly relevant to Patton Boggs's ongoing attempt to attack Chevron's reputation and goodwill and disrupt shareholder relations by adverse publicity and other means in order to force a payment of money by Chevron.

30.     The district court denied Patton Boggs's motion to amend as futile and dismissed the complaint, holding that the tortious-interference claims failed because Patton Boggs had not alleged that a contract was actually breached, and rejecting Patton Boggs's argument that it did not need to allege a breach, and stating:  "Patton Boggs misunderstands the law."  *Patton Boggs I*, 791 F. Supp. 2d at 20.  The court then dismissed the original complaint seeking a declaratory judgment on the ground that Patton Boggs was asking the court to resolve ethical questions that might arise before other judges.  *Id.* at 25.

31.     Styling a new filing as a motion for reconsideration, Patton Boggs moved to alter or amend that judgment under Federal Rule of Civil Procedure 59(e), asking the district court to reinstate its lawsuit and to allow it to amend its complaint to add new tort claims.  It simultaneously filed in the same court a separate lawsuit against Chevron and Gibson Dunn, with a complaint virtually identical to its proposed second amended complaint in the first action. Both the second amended complaint and the complaint in the "new" lawsuit included, for the first time in the litigation, a claim for tortious interference with contract under § 766A of the Restatement (Second) of Torts.  The new complaints also included for the first time a vague, one-sentence allegation that Chevron and Gibson Dunn had "undertak[en] efforts to cut off the

Ecuadorian Plaintiffs' source of funds, causing the Ecuadorian Plaintiffs to breach their contract with Patton Boggs by non-payment of Patton Boggs's legal fees and expenses." *Patton Boggs, LLP v. Chevron Corp.*, 825 F. Supp. 2d 35, 41-42 (D.D.C. 2011) ("*Patton Boggs II*").

32.    The district court denied Patton Boggs's Rule 59(e) motion and rejected the proposed amended complaint. 791 F. Supp. 2d at 30.

33.    The court then dismissed Patton Boggs's tortious interference claim—both because it was untimely and because District of Columbia courts have never adopted it as a cause of action. The court added that "[e]ven if Patton Boggs's argument were not untimely, and even if the Court were to apply § 766A precisely as written, Patton Boggs's proposed amended complaint would still fail to state a claim for tortious interference" because it identified no "'pecuniary loss'" arising from the defendants' alleged conduct—a required element under § 766A. *Id.* at 31. "Simply put," the district court summarized, "Patton Boggs's argument is a day late and a dollar short." *Id.* at 32. The court also rejected Patton Boggs's request to reconsider its decision not to issue a declaratory judgment, observing that Patton Boggs continued to press "wholly unsupported" legal arguments. *Id.* at 28.

34.    Even after that order, Patton Boggs refused to withdraw its "new" lawsuit, which presented the same claims the district court had repeatedly rejected. Accordingly, for a third time, the district court was forced to issue an opinion holding that Patton Boggs's claims were meritless and could not proceed. In light of "Patton Boggs's acknowledge[ment] that four of its five claims are identical to those that the Court dismissed or denied leave to add" in its first opinion, the court concluded that they were barred by claim preclusion or res judicata. *Patton Boggs II,* 825 F. Supp. 2d at 39.

35.     The court then held that the tortious-interference claim—premised on the new, one-sentence allegation that the defendants had undertaken efforts to cut off the LAPs' payments to Patton Boggs—failed to state a claim on which relief could be granted.  The court explained that the single conclusory factual allegation failed to satisfy the *Iqbal* pleading standard: "Conspicuously absent here are any allegations describing defendants' conduct, or plausibly suggesting that it was intended to cause a breach of Patton Boggs['s] contract."  *Id.* at 42. Rather, the new allegation "merely rephrases the fourth element of tortious interference: 'intentional procurement of the contract's breach.'"  *Id.* (quoting *Murray v. Wells Fargo Home Mortg.,* 953 A.2d 308, 325 (D.C. 2008)).

36.     The court also "acknowledge[d] defendants' suggestion that Patton Boggs, by filing this action after the dismissal of its first suit, may have 'unreasonably and vexatiously' multiplied the proceedings before this Court within the meaning of 28 U.S.C. § 1927."  *Patton Boggs*, 825 F. Supp. 2d at 42.  The court stated that sanctions were not "presently warranted"— but "only because the bar for the imposition of fees and costs under § 1927 is extremely high." *Id*.

37.     Patton Boggs appealed, and the D.C. Circuit affirmed in all respects, concluding that the District Court's analysis was "spot on."  *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 401 (D.C. Cir. 2012); *see also id*. at 404 ("We are left in the dark as to who breached what obligation and how, and the manner in which the defendants intentionally caused that breach. The complaint does not allege the requisite 'plausible scenario' that could show Patton Boggs is entitled to relief.").

**<u>Patton Boggs Furthered the Fraudulent Scheme Beginning in 2010</u>**

38.     Meanwhile, aware that the "Cabrera Report" was a fraud, Patton Boggs

orchestrated what Westenberger described as an effort to "cleanse" the "Cabrera Report"—*i.e.*, to whitewash the supposedly neutral expert report by making false representations mischaracterizing the relationship between the LAPs' attorneys and Cabrera, and by bringing in new experts who relied on Cabrera's data while purporting to confirm Cabrera's conclusions on an independent basis—all without disclosing the fraudulent nature of the ghostwritten report.[2] *See Chevron Corp. v. Weinberg Grp.*, No. 1:11-mc-00409, Dkt. 24, at 3-4 (D.D.C. Sept. 8, 2011); *see also id.* Dkt. 18-6, at 2 (e-mail from Westenberger).

39.     In this capacity, Patton Boggs drafted statements it knew to be false and misleading, caused them to be filed in U.S. and Ecuadorian courts, and recruited and worked closely with the Weinberg Group, a firm based in Washington, D.C. that was hired "to coordinate the work of the cleansing experts." *See Weinberg Grp.*, No. 1:11-mc-00409, Dkt. 24, at 4.

40.     Patton Boggs also directed the creation of a declaration, ostensibly from the LAPs' Ecuadorian attorney Pablo Fajardo, but in fact written in the United States and in English. This declaration purported to describe, but in fact mischaracterized, the relationship between the LAPs and the Ecuadorian court-appointed expert Richard Cabrera. It falsely attested that Cabrera was "independent" and that "Chevron enjoyed the same opportunity as Plaintiffs to provide materials to Cabrera"—statements that Patton Boggs knew to be false. Patton Boggs omitted from this declaration the substantial role that the LAPs' attorneys had played in securing

---

[2]     The "cleansing experts" were involved in the planning and drafting of the seven reports filed by the LAPs in the Lago Agrio litigation on September 16, 2010, purporting to assess damages of up to $113 billion against Chevron; these experts include, without limitation, The Weinberg Group, Douglas Allen, Lawrence Barnthouse, Carlos Picone, Daniel Rourke, Paolo Scardina, Jonathan Shefftz, Patton Boggs, and their agents and employees.

Cabrera's appointment, their secret payments to and numerous personal meetings with Cabrera, and the massive U.S. project to write, translate, and submit the fraudulent Cabrera Report.

41.     Patton Boggs caused this fraudulent declaration to be filed in at least eight U.S. federal courts—including the Southern District of New York—despite the fact that Patton Boggs's co-counsel described it as "misleading at best," and even after overwhelming evidence of the omitted aspects of the relationship were made public.

42.     Although well aware that the Ecuadorian judgment was a fraud, Patton Boggs stated that it came "into this case charged with seeing that a judgment that would command international respect in Ecuador would be entered, and if it was entered, to develop an enforcement strategy."

43.     Patton Boggs attorneys authored the "Invictus" strategy memorandum, which outlined Patton Boggs's plan to use its "political connections and strategic alliances" to enforce an Ecuadorian judgment in receptive foreign jurisdictions by "leverag[ing] the firm's relationship with governments of foreign nations" to overcome "barriers to judgment recognition" as part of a "multiple front[]" assault against Chevron that would "compound the pressure" on Chevron to settle.  Patton Boggs used the "Invictus" memorandum to solicit funding for the fraudulent scheme.

44.     Despite overwhelming and unrebutted evidence that the Ecuadorian judgment itself, and the "Cabrera Report" upon which it is based, were fraudulently ghostwritten by the LAPs' own team, Patton Boggs has continued to throw its efforts behind the fraud.

45.     Patton Boggs also supervised the preparation of the draft "alegato" (the LAPs' final brief to be submitted to the Lago Agrio court) soon after joining the LAPs' fraudulent scheme.  In the spring of 2010, Patton Boggs attorneys Westenberger and Tyrrell received a

"working draft of the Alegato"—a draft that the LAPs' counsel feared "relie[d] too heavily" on the discredited Cabrera Report. In November 2010, LAP lawyer Steven Donziger forwarded the draft alegato to Patton Boggs attorneys Westenberger and Adlai Small. The draft quoted from, and cited to, the "Unfiled Fusion Memo" (the LAPs' memo on the pivotal issue of whether the Ecuadorian court could exercise jurisdiction over Chevron and hold it liable for the alleged actions of TexPet), which the LAPs intended to attach as an appendix. After reviewing the draft alegato, the LAPs organized a "rescue team," led by Patton Boggs's Westenberger and Ed Yennock, to "improve," "supplement," and "redraft" the document. Text messages on Donziger's cell phone confirm that Patton Boggs "handle[d] alegato assignments" and continued to revise the alegato until it was filed.

46.    It was during the redrafting process headed by Patton Boggs that the LAPs decided not to attach the Unfiled Fusion Memo as an appendix to their final alegato, and deleted from the final alegato all citations to, and quotations from, the Unfiled Fusion Memo. Yet, the judgment contains text that is identical to text in both the draft alegato and Unfiled Fusion Memo, but not in the final alegato or otherwise in the record. Thus, Patton Boggs knew what was in the draft alegato and what was taken out before filing. At the time the LAPs' unfiled work product then showed up in the Ecuadorian judgment, Patton Boggs knew or must have known that LAPs' team was behind the drafting of the judgment itself. Nonetheless, despite this knowledge of the fraudulent and corrupt nature of the Ecuadorian judgment, Patton Boggs has continued to spearhead efforts to damage Chevron by enforcing the Ecuadorian judgment as though it were the legitimate product of an impartial judicial system.

47.     In 2009, Chevron commenced international arbitration proceedings pursuant to the United States-Ecuador Bilateral Investment Treaty.  Chevron soon thereafter commenced multiple actions under 28 U.S.C. § 1782, seeking discovery for use in that arbitration.

48.     By May 2010, Patton Boggs had begun working in the United States to delay and obstruct discovery in a number of these § 1782 actions.

49.     Patton Boggs, through its partners James Tyrrell and Eric Westenberger, engaged in systematic efforts to obstruct and delay these discovery proceedings in order to prevent the full extent of its own misconduct and that of other counsel for the Ecuadorian plaintiffs from coming to light.

50.     Patton Boggs, through Westenberger, also worked behind the scenes with attorneys for Stratus Consulting, Inc., instructing them to ignore or disobey deposition subpoenas or make themselves or their clients unavailable to prevent the depositions from proceeding.  On one occasion, which Stratus's lawyer described in a contemporaneous email as "disturbing," Westenberger challenged Stratus "to take positions which are implausible at best, and very possibly spurious."  Westenberger "backed down" temporarily when Stratus's counsel pointed out that "his position was at odds with express statutes."  But a few days later, Westenberger demanded that Stratus's lawyer make himself, or the Stratus witnesses, "unavailable in order to keep the depositions from proceeding."  In light of this request, Stratus's lawyer declined further discussions with Westenberger on the topic, because "[i]f I am ever asked whether I participated in a conversation in which a plan to obstruct Chevron's subpoenas was considered, I want to be able to say no."

51.     In another discussion between Patton Boggs's Westenberger and Donziger and others, in May 2010, Westenberger proposed the following strategy in order to delay production

of Stratus's materials:  "Appeal; move for stay; if we win with [the District Judge] great; if we lose, we produce whatever we want (narrow read); [Gibson Dunn] complains and then we move for clarification.  If we lose again, we think about another appeal."  Patton Boggs's efforts to prevent the Cabrera fraud from coming to light constituted wire fraud and obstruction of justice.

52.   By July 2010, Patton Boggs had begun producing documents to Chevron (although at the time Patton Boggs was still concealing its role), and strategically avoided turning over any "potentially damaging" documents, even if they were relevant and responsive. On July 1, 2010, a Patton Boggs associate emailed Westenberger informing him that "[u]nfortunately" they were "coming to the end of the road in terms of 'publicly available' material to produce," and that as a result they may need to begin producing "documents we were trying to hold off on producing that are non-privileged but potentially damaging."

53.   Patton Boggs also advised its clients and co-counsel to deny the existence of relevant and discoverable material that was known to Patton Boggs, including but not limited to portions of the "documentary" film *Crude*, which have proven central to uncovering the fraud and other misconduct by which Patton Boggs and others procured the Ecuadorian judgment.[3]

54.   As described above, Patton Boggs concealed its representation of the LAPs from at least April 2010 until November 2010, when the firm first entered an appearance in an appeal of one of Chevron's § 1782 actions.  Patton Boggs attorneys have since entered appearances on behalf of the LAPs in ongoing matters in several courts seeking to obstruct Chevron's discovery under 28 U.S.C. § 1782.

---

[3]      *See In re Chevron Corp.,* No. 10-mc-00021-JH-LFG (D.N.M. Sept. 13, 2010) Dkt. 173 at 12 ("The undersigned viewed those outtakes [from *Crude*] and finds that they are sufficient to establish a *prima facie* case of attempted fraudulent activity by attorney Donziger, including directing Respondents to 'extrapolate' scientific evidence that does not exist, and having a purportedly neutral expert sign his name to a report that was actually prepared by Plaintiffs' attorneys and experts without Chevron's knowledge.").

**Patton Boggs Deceives Burford into Providing $4 Million to Fund the Fraudulent Scheme**

55.     In November 2009, Burford Financial Group, Ltd. was approached by Donziger in connection with a possible investment in the Lago Agrio Litigation. Burford had a special and multifaceted relationship with James Tyrrell of Patton Boggs, who had previously been a partner at the same national law firm as four senior Burford personnel. Patton Boggs also provided Burford with rent-free office space in its New York City offices during the pendency of the diligence and negotiation process regarding the Lago Agrio Litigation. Tyrrell and Patton Boggs's assumption of a leadership role in the Lago Agrio Litigation transformed the Lago Agrio Litigation into an investment possibility for Burford.

56.     Because it was not feasible for Burford to conduct diligence into certain matters with respect to the Lago Agrio Litigation, such as reviewing the record of the Ecuadorean proceeding or conducting on-site diligence in Ecuador, Burford agreed that Patton Boggs would provide its analysis on those matters as well as on its judgment enforcement strategy.

57.     Patton Boggs's analysis was memorialized in the "Invictus" strategy memorandum. Burford made clear to Patton Boggs that its investment committee could not consider the proposed investment without the Invictus memorandum, and the committee's consideration was delayed during the summer of 2010 because of delays in the production of the memorandum. Patton Boggs provided the Invictus memorandum to Burford, and the memorandum was then presented to the investment committee in September 2010.

58.     The "Invictus" memorandum contained numerous false statements and misrepresentations, upon which Burford relied. The Invictus memorandum stated that Chevron was "distort[ing]" reality by raising objections to the Cabrera Report, that Chevron was likely responsible for engaging in similar behavior such as dealing directly with experts and drafting

16

experts' reports, and that "no Ecuadorian law or rule" prohibited the contacts between the LAPs' representatives and Cabrera.  It further described Chevron's attempts to have the Lago Agrio Litigation dismissed because of the Cabrera fraud as "especially frivolous."  These statements were false.

59.     The Invictus memorandum also outlined Patton Boggs's plan to submit additional "cleansing" expert reports to the Ecuadorian court, and stated the reports "will not need to rely on the Cabrera Report to quantify damages" because the "factual record in the Ecuadorian court is replete with independent evidence of the extensive damages caused by Chevron."  Burford later learned that the underlying bases of the Cabrera Report were tainted by the LAPs' representatives having ghostwritten the Cabrera Report, and that the cleansing experts had relied on the same tainted bases.

60.     Patton Boggs did not disclose to Burford that the LAPs' Ecuadorian counsel were concerned that they could all "go to jail" because of their contacts with Cabrera, that at Donziger's instruction Stratus and the LAPs' Ecuadorian team had ghostwritten the Cabrera Report without the knowledge of Chevron or the Ecuadorian court, that the Ecuadorian court had issued orders requiring Cabrera's impartiality, or that Cabrera and the LAPs had repeatedly assured Chevron and the Ecuadorian court that Cabrera was impartial.

61.     In reliance on Patton Boggs's false and misleading statements and material omissions, Burford entered into a funding agreement with the LAPs (the "Funding Agreement"). The Funding Agreement contemplated three tranches of funding that would total $15 million. The first tranche, due November 1, 2010, was $4 million.  The next two tranches, if funded, were to consist of $5.5 million each.  The Funding Agreement required the LAPs to request funding of each subsequent tranche, which Burford could decline under specified conditions.  Burford's

funding was to be paid only and directly to Patton Boggs and held in a trust account, and Tyrrell's personal approval was required for its disbursement.

62.    On October 26, 2010, just prior to executing the Funding Agreement, Burford created Treca Financial Solutions, a Cayman Islands company.  Treca is the entity that stood to recover any proceeds under the funding agreement and the related Intercreditor Agreement, which governs the priority of recoveries of the various funders of the Lago Agrio Litigation and related litigations.  Treca funded the first tranche of $4 million on November 2, 2010, by making a payment to Patton Boggs.

63.    Chevron filed a RICO action against Donziger and others on February 1, 2011. The Court in that action issued a Temporary Restraining Order ("TRO") on February 9, 2011, which precluded Burford and Treca from providing additional funds.  The Court then issued a preliminary injunction on March 7, 2011.

64.    Just days before Chevron filed its RICO action in the Southern District of New York, on January 27, 2011, Patton Boggs's lead lawyer James Tyrrell called Burford's Christopher Bogart to discuss the status of the litigation.  For the first time, Tyrrell said to Burford that Donziger had not told them the extent of his prior contacts with Cabrera, that Donziger had previously said the contacts were limited but in fact they were voluminous.  Tyrrell claimed that Donziger never disclosed the vast majority of contacts despite being asked specifically about them, and that Donziger's testimony in his deposition varied greatly from what he had told them previously.  Tyrrell also said that the firm was "discussing its ethical obligations" and "evaluating what to do."

65.    During that same status update, Tyrrell told Burford that Patton Boggs had a team in Ecuador working on the LAPs' final briefing, and that they had just completed a 120-page

module on liability, that the damages piece was done and being translated into Spanish, and that additional pieces were being written by his team. Tyrrell said that he had put together a complete plan and was running the process. He also said that it was difficult to believe that the forthcoming judgment would not include significant damages and that the judgment would be enforceable in many countries in part because it would be rendered by a "new judge" who was "unexposed."

66. During the same conversation in which Tyrrell told Burford that Donziger's testimony in his deposition had led Patton Boggs to evaluate what to do and its ethical obligations in the face of this allegedly previously undisclosed information, Tyrrell admitted to Burford that there was enormous financial pressure at Patton Boggs to continue its prosecution of the Ecuadorian litigation against Chevron in view of the expected size of the forthcoming judgment. Tyrrell also told Burford that Donziger was a "fool."

67. On February 15, 2011, the LAPs issued a "Funding Notice" requesting funding of the second tranche of the Funding Agreement.

68. On February 21, 2011, Treca told the LAPs that the Funding Notice was invalid because the TRO barred them from issuing a Funding Notice. Treca also stated that providing further funding would likely violate the TRO, and that it was unable to consider any request to fund the second tranche until the TRO was lifted. Treca further noted that the serious allegations of fraud and misconduct that were coming to light "appear to contravene directly the representations made to the Funder in the Funding Agreement," among other violations of the Funding Agreement.

69. By the time that the Second Circuit lifted the preliminary injunction on September 21, 2011 (*see infra*, ¶ 74 n.4), Treca had determined that the LAPs were in breach of

the Funding Agreement and decided to terminate it.  Burford, as Treca's investment advisor,

informed the LAPs via letter on September 23, 2011, that "[i]n addition to breaching the Funding

Agreement—through misrepresentations and other material failures—the conduct discovered

amounts to fraud."  Burford further stated that it believed that the LAPs "and particularly [their]

US representatives engaged in a multi-month scheme to deceive and defraud in order to secure

desperately needed funding from Treca, all the while concealing material information and

misrepresenting critical facts in the fear that we would have walked away had we known the true

state of affairs."

70.     The September 23, 2011 Letter explained that Burford had relied on false

statements from Patton Boggs in making its decision to invest in the litigation.   Burford

explained the misrepresentations of the Invictus memorandum:

> In the Invictus report, we were told: "Chevron claims that the outtakes show
> unlawful collusion between Plaintiffs, their experts, and Mr. Cabrera . . . .  But as
> with virtually any other claim by Chevron in this litigation, reality is being
> distorted here."  (Page 4).  The Invictus report also said that "Chevron has cited in
> its submissions no Ecuadorian law or rule that prevents ex parte communication"
> (page 5) and that Chevron is "[c]leverly using the lens of U.S. norms to distort
> what transpired in Ecuador" and "us[ing] its findings regarding Plaintiffs'
> involvement with the Cabrera Report to create the impression that it is the victim
> of an injustice in Ecuador." (Page 4)   Throughout, you characterize Chevron's
> "arguments concerning Mr. Cabrera" as "misleading." (Page 4)  Separately from
> the Invictus Report, you assured us that your contacts with Cabrera were limited
> and entirely permissible.

71.     Burford went on to explain that "[w]hile it may have had other functions as well,

a key function of the Invictus memorandum was to provide us and Treca with Patton Boggs'

analysis of the case as a major part of our recommendation and Treca's investment decision.

That function—and our and Treca's reliance on the Report—was clearly understood by all

involved.  Indeed, when the Report was delayed in July 2010, so too was Treca's investment

decision because of non-receipt of the Report."  Burford would not have agreed to enter into the Funding Agreement had it been informed of the truth of the Cabrera Report.

**Patton Boggs Deceptively Obstructs Chevron's Case in the Southern District of New York**

72.     On February 1, 2011, Chevron filed suit in the Southern District of New York against the LAPs and certain of their agents for civil violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964, among other claims (the "RICO action").  Though not a defendant, Patton Boggs is a named co-conspirator in the RICO action and has appeared on its own behalf to move to quash Chevron's document subpoena.

73.     Chevron also sought declaratory and injunctive relief in the RICO action prohibiting the defendants and others acting in concert with them from acting to enforce the fraudulent Ecuadorian judgment.

74.     On February 8, 2011, after a hearing and opportunity for briefing, the Court issued a temporary restraining order preventing the defendants and those acting in concert with them from seeking to enforce outside of Ecuador the then-imminent judgment in the fraudulent Ecuadorian lawsuit against Chevron (the judgment issued against Chevron six days later for $18.2 billion).  *See Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581 (S.D.N.Y. 2011).  Because the defendants had not requested a specified bond amount, the Court ordered Chevron to post a $10,000 bond.  Nos. 11 Civ. 0691, 11 Civ. 3718 (LAK) (JCF), Dkt. 77 (Feb. 9, 2011).  The Court later granted Chevron's motion for a preliminary injunction on March 7, 2011.  *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 660 (S.D.N.Y. 2011).[4]

---

[4]       Patton Boggs represented the LAPs in the Second Circuit on appeal from the injunction. On September 19, 2011, the Second Circuit lifted the injunction.  *Chevron Corp. v. Naranjo*, No. 11-1150-cv(L), 2011 WL 4375022 (2d Cir. Sept. 19, 2011).

75.     Patton Boggs actively concealed its representation of the LAPs before the Southern District of New York.  To contest Chevron's application for the temporary restraining order, two of the individual Ecuadorian plaintiffs in the Lago Agrio case appeared in the RICO case through counsel other than Patton Boggs.  It soon became clear, however, that Patton Boggs was controlling the representation.  Although another attorney signed the papers filed on February 8, 2011, in opposition to Chevron's application, that attorney revealed to the Court during a hearing the same day that Patton Boggs had authored them.  The attorney further made it clear that Patton Boggs controlled the content of the papers, complaining that Patton Boggs had left him "fit to be tied" by burying his preferred argument on page 36 of the opposition brief.

76.     Also not disclosed to the Southern District of New York was Patton Boggs's increasing financial control over the LAPs' U.S. court actions.

77.     As described above, in late 2010, Patton Boggs had arranged for the LAPs' legal team to receive a multimillion dollar financing from the Burford Group, a litigation-finance firm and a Patton Boggs client.

78.     This investment was essential to the continued survival of the fraudulent scheme, because the scheme's previous main financial backer, another U.S. law firm, had withdrawn when Chevron began to uncover the truth about the fraud.

79.     As part of this deal, the individual Ecuadorian plaintiffs effectively surrendered their economic interest in the judgment and any influence they may have had over the Ecuadorian and U.S. legal proceedings, and Patton Boggs obtained substantial rights in any recovery.

80.     By 2011, Patton Boggs had also obtained approval authority over all U.S. expenditures made in support of the fraudulent scheme (purportedly on the LAPs' behalf),

including legal fees for attorneys appearing on the LAPs' behalf in U.S. courts and, on information and belief, funding of the LAP team's public relations smear campaign against Chevron.

81.     In the course of the RICO action in the Southern District of New York, Patton Boggs, through Tyrrell and Westenberger, (1) falsely portrayed Cabrera, the "global damages expert" in the Ecuadorian proceedings, as an independent and neutral advisor to the Ecuadorian court who merely tried to "assist the court in arriving at an appropriate valuation for each category of damages at issue in the case" by, among other things, "perform[ing] no fewer than forty-eight separate inspections on his own", and (2) indicated that the Ecuadorian court had authorized ex parte contacts between Cabrera and the LAPs' representatives:   "'[T]he Ecuadorian court was and is well aware of the Ecuadorian plaintiffs' ex parte contacts with Cabrera and submission of materials to him—and, indeed, invited, such contacts and submission."

82.     Patton Boggs, Tyrrell, and Westenberger knew these representations were false because they had participated in preparing and composing both the misleading Ecuadorian filing that purported to disclose, but, in fact, misrepresented the relationship between the LAPs and Cabrera, and the "cleansing reports" that supposedly cured the Ecuadorian judgment of the LAP team's corruption and fraud.

83.     Patton Boggs, through Tyrrell, in appearances before the United States Court of Appeals for the Second Circuit, has made a number of misstatements that he knew to be false. For instance, in a November 2010 oral argument, he represented to the Second Circuit that it was "impractical[]" for his clients to prepare a privilege log because "[t]here is no money on this side of the cases."  That representation was knowingly false: The plaintiffs had already secured a $15

million commitment from a Burford, as Tyrell well knew, because Patton Boggs, through Tyrrell himself, was instrumental in securing that funding.

84.     In that same oral argument, as described above, Tyrell falsely claimed that Patton Boggs "only came into the case last Thursday," even though the firm had been secretly involved in the case for months and had directed legal strategy for the LAPs' in the Southern District of New York.

85.     In a May 2011 argument before the Second Circuit, in urging the court to issue a stay of the Court's preliminary injunction, Tyrell reiterated his false representation that "[w]e simply do not have the resources to go through tremendous discovery."

86.     In a brief signed by other lawyers, but subject to Patton Boggs's approval and oversight, other counsel for the LAPs requested that the Southern District of New York continue the trial date for Chevron's injunctive and declaratory relief action, other counsel for the LAPs, requested that the Southern District of New York continue the trial date for Chevron's injunctive and declaratory relief action, based, in part on their assertions that (1) they needed the time to obtain the outtakes of the movie "Crude," which Chevron had obtained through discovery and which revealed aspects of the LAPs' attorneys' fraud; (2) they "do not have a copy of the outtakes," which, "on information and belief, . . . alone entail more than 600 hours of material" and would require 15 weeks of 40 hour work weeks, "just to review. . . much less to sort it in a responsive manner."

87.     This was a fabrication.  In truth, the LAPs had been provided the complete outtakes, along with a log of all the footage, a year earlier by the filmmakers.  And since receiving it, their attorneys and staff had been reviewing the footage, preparing summaries, ordering transcriptions made, and digitizing portions for future search and retrieval.

88.     Nor was this the only false statement made by Patton Boggs and those under its supervision in the New York litigation.  The LAPs' attorneys ghostwrote not just the Cabrera Report, but the Ecuadorian judgment itself.  Substantial portions of the Ecuadorian judgment appear word-for-word in the LAPs' attorneys' internal files, which appear nowhere in the record, and data in the judgment bear the same errors and idiosyncrasies as data found in the LAPs' attorneys' files, but not data found in the record.  Moreover, a former Ecuadorian judge (Alberto Guerra) has come forward and revealed that he was paid thousands of dollars by the LAPs' team and a subsequent judge (Nicolas Zambrano) for illegally ghostwriting judicial orders issued by Zambrano and steering the case in the LAPs' favor.  In fact, the LAPs' lawyers were permitted to draft the $18 billion judgment in their own favor after they promised to pay Zambrano a $500,000 bribe out of the judgment's enforcement proceeds.

89.     The LAPs' attorneys, including Patton Boggs, have never offered any meaningful response to this evidence.  Patton Boggs, through Tyrrell and Westenberger, did challenge a single piece of this evidence before the U.S. Court of Appeals for the Second Circuit, but its attempted explanation was quickly revealed as a falsehood.  In a brief to the Second Circuit signed by Tyrrell, the firm falsely told the court that (1) Chevron "cites only a single email" (*i.e.*, the "Fajardo email") in support of its allegations that the LAPs' attorneys wrote the fraudulent Ecuadorian judgment; (2) that this email contained "'stock' language used by [the Ecuadorian] court"; and (3) that "[t]he lesson to be learned here is that one must always scrutinize Chevrons' exhibits."

90.     Patton Boggs, through Tyrrell, lied to the Second Circuit.  The Fajardo Trust email and the judgment contain matching or similar word strings and strings of symbols whose presence is not explainable either as set phrases or by chance.  The overlap includes:  (i) the

Fajardo Trust email misquotes language from the key case cited, and that same misquote appears in the judgment; (ii) the Fajardo Trust email miscites the key case yet the same miscitation shows up in the judgment; (iii) another case, having nothing to do with trust law, is incorrectly cited as authority for "the legal basis of the trust" using the same shorthand citation in both the Fajardo Trust email and the judgment; and (iv) the same explanatory language and phrases regarding use of judgment trusts appear verbatim in the email and judgment.  The Fajardo Trust email was not part of the Lago Agrio court record, nor was the substance of that email.

91.    Patton Boggs was aware that the final alegato it wrote said nothing about setting up trusts—that analysis was only in the unfiled Fajardo Trust email.  Accordingly, when Patton Boggs represented to the Second Circuit that the overlapping language was merely "'stock' language used by courts in similar cases," Patton Boggs knowingly misled the court and played an active role in covering up the fraud.

**Patton Boggs Files a Vexatious Suit in the District of New Jersey**

92.    On February 15, 2012, Patton Boggs filed its fourth complaint against Chevron, this one in the District of New Jersey, with Tyrrell as "pro se" counsel, seeking (i) to execute on a federal bond posted by Chevron to cover alleged damages stemming from the preliminary injunction that Chevron obtained in the Southern District of New York; (ii) attorneys' fees under New York law; (iii) damages for malicious prosecution; and (iv) unjust enrichment.  *Patton Boggs*, *LLP v. Chevron Corp.*, 12-cv-00901-ES-CLW, Dkt. 8 (Mar. 19, 2012) (the "Patton Boggs action").  The complaint relied on the Second Circuit's vacatur of the district court's preliminary injunction to support all four claims.

93.    Chevron moved to transfer the Patton Boggs action to the Southern District of New York pursuant to 28 U.S.C. § 1404 and the "first-filed" rule of federal comity.  On July 18,

2012, Magistrate Judge Cathy L. Waldor issued a report and recommendation, recommending that Chevron's motion be granted based on the relevant public and private factors and the interests of justice.  12-cv-00901-ES-CLW, Dkt. 38 (D.N.J.).

94.    On December 14, 2012, District Judge Esther Salas adopted Judge Waldor's recommendation and granted Chevron's motion to transfer.  12-cv-00901-ES-CLW, Dkt. 42 (D.N.J.).  Judge Salas found Patton Boggs "guilty of [jurisdictional maneuvering].  It appears that [Patton Boggs] strategically avoided an appearance in the [RICO Action pending in the Southern District of New York] when Chevron filed its motion to exonerate the bond.  [Patton Boggs] had the opportunity to make its arguments against exoneration and chose not to.  [Patton Boggs] must live with the effects of that strategy."  *Id*. at 2-3.

95.    Accordingly, on December 17, 2012, the Patton Boggs action was transferred to the Southern District of New York, given case number 12cv9176, and listed as "possibly related" to the RICO action.  The action was assigned to Judge Lewis A. Kaplan on December 21, 2012.  On February 12, 2013, this Court referred the Patton Boggs action to Magistrate Judge Francis for a report and recommendation on Chevron's motion to dismiss.

96.    On March 11, 2013, Judge Francis issued his report and recommendation on Chevron's motion to dismiss.  He recommended that the case be dismissed.

97.    In the event that this Court dismisses Patton Boggs's present claims against Chevron, as Chevron believes it should, Chevron's claim for malicious use of process will be ripe based on Patton Boggs's actions in this case.

### Patton Boggs Pursues Enforcement of the Fraudulent Ecuadorian Judgment

98.    In accordance with the strategy laid out in the Invictus memorandum, Patton Boggs has proceeded with efforts, on behalf of the LAPs, to attach Chevron's assets and those of

related, separately incorporated companies and to enforce the Ecuadorian judgment.

99.    The Invictus memorandum included a section titled "Identification of Accounts and Assets Potentially Subject to Attachment," which listed Chevron-related entities that Patton Boggs intended to pursue in satisfaction of the Ecuadorian judgment.

100.    On September 26, 2012, the LAPs sought an order from the Provincial Court of Sucumbios that would attach assets owned by Chevron subsidiaries in Ecuador, and would deem the assets of certain Chevron subsidiaries in other countries to be the property of Chevron.  On information and belief, Patton Boggs assisted the LAPs in seeking this order.

101.    On October 11, 2012, Judge Luis Alberto Legña Zambrano, who had been presiding over the Lago Agrio Litigation, was removed and replaced by Judge Wilfrido Erazo Araujo.

102.    Just one working day later, on October 15, 2012, Judge Erazo issued an embargo order at the request of the LAPs (the "Ecuadorian Embargo Order").  The order deems the assets of "all the companies, affiliates and/or subsidiaries" listed in an annex to the Chevron Corporation Form 10-K for the fiscal year ending on December 31, 2011 as "Chevron Corporation" and imposes the $19 billion fraudulent Ecuadorian judgment over all those entities. The order also attached the funds deposited and existing in an account in the name of Texaco Petroleum Company in Ecuador (totaling $358.92), as well as intellectual property assets (including distinctive logos and royalties and income generated by the use, sale and distribution of such logos) identified by the LAPs in their September 26, 2012 petition.

103.    The Chevron-related entities listed in the Ecuadorian Embargo Order include entities located in nations identified in the "International Enforcement Plan" section of the *Invictus* memorandum under the title, "International Forums of Particular Note."  The Invictus

memorandum explains that these are nations in which Chevron "conducts substantial affairs and likely has substantial assets" and where Patton Boggs "has affiliations or long-standing relationships with law firms or public affairs firms."  The nations identified by Patton Boggs in the Invictus memorandum and identified in the Ecuadorian Embargo Order as places where Chevron Corporation has affiliates include the Philippines, Singapore, Australia, Argentina, Brazil, Venezuela, Canada, Nigeria, Netherlands, Indonesia, Chad, New Zealand, and the United Kingdom.

104.    On October 25, the Ecuadorian court issued a second Order, in which it added several intellectual property assets and an additional ownership interest of Chevron Argentina S.R.L. to the assets purportedly subject to its October 15 Ecuadorian Embargo Order ("Ecuadorian Expansion Order").  The Ecuadorian Expansion Order attached additional trademarks listed in the LAPs' September 26, 2012 petition.

105.    On information and belief, Patton Boggs assisted the LAPs in commencing an *ex parte* action in Argentina on November 5, 2012.  That action purported to rely on the Ecuadorian Embargo Order and the Ecuadorian Expansion Order, and sought to execute the preventive measures that had been mandated in the Ecuadorian Embargo Order, specifically seeking the embargo of the Argentine assets of several Chevron Corporation subsidiaries—Chevron Argentina S.R.L. and Ing. Norberto Priú S.R.L. of Argentina and CDC ApS and CDHC ApS of Denmark.

106.    On November 6, 2012, the Argentine court issued an *ex parte* embargo order attaching a variety of assets, including shares, bank accounts, and receivables, held by the Argentine and Danish subsidiaries that had been identified in the Ecuadorian Embargo Order ("Argentine Embargo Order").

107.    Through the Argentine Embargo Order the LAP team claims to have damaged Chevron.

108.    On information and belief, Patton Boggs has also assisted the LAPs in bringing enforcement actions in Canada and Brazil.

109.    To the extent Patton Boggs and/or the LAP team or associates are ever able to enforce any part of the corrupt Ecuadorian judgment and cause Chevron additional harm, Patton Boggs and its co-conspirators would be jointly and severally liable to Chevron for all amounts obtained through the fraudulent scheme.

## FIRST COUNTERCLAIM FOR RELIEF
### (Fraud)

110.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph as if set forth in full.

111.    Patton Boggs and its agents and others acting at its behest have knowingly misrepresented, omitted, and/or concealed material facts in their pleadings and representations before U.S. courts, in their communications to federal and state government agencies and officials, and in their communications to Chevron, analysts, and the media.  These false representations include the submission of the "cleansing reports," statements regarding the true authorship of the Cabrera Report, the denial of any improper contact between the LAPs' attorneys and Cabrera (including the bribes using a "secret account" with funds wired from the United States), assurances of the supposed independence and neutrality of Cabrera and his liability and damages assessment, and the fraudulent endorsements of the Cabrera Report. Patton Boggs has orchestrated the enforcement strategy and attempted enforcement of the Ecuadorian judgment against Chevron, which judgment it knows to be the product of a corrupt and fraudulent court process that has been directed by its U.S. and Ecuadorian co-counsel.

Despite this knowledge, Patton Boggs has falsely represented the Ecuadorian judgment to be the product of a legitimate judicial process.

112.    Patton Boggs and its agents knowingly misrepresented, omitted, and/or concealed material facts in their representations to Burford in an effort to secure funding for the fraudulent scheme.  These false representations included numerous statements in the Invictus memorandum regarding the nature of the LAPs' contacts with Cabrera, the appropriateness of such contacts under Ecuadorian law, and the purported weakness of Chevron's arguments regarding the Cabrera Report.  Patton Boggs concealed from Burford the material facts that plaintiffs had ghostwritten the entire Cabrera Report and that the LAPs' Ecuadorian lawyers were concerned that they might go to jail if the ghostwriting became public.

113.    Patton Boggs made these false representations while knowing that its misrepresentations were materially false and/or that its omissions were material.

114.    Patton Boggs made these misrepresentations, misleading half-truths, and/or fraudulent omissions with the intent of obtaining favorable rulings from the U.S. and foreign courts, wrongfully inducing U.S. state and federal agencies to pursue investigations of Chevron, propagating false information about Chevron to shareholders, investors, analysts, and the media, and convincing Burford to invest millions of dollars of litigation funding.

115.    These material misrepresentations and/or omissions have been reasonably and justifiably relied upon by, among others, Chevron, Burford, the United States courts, state and federal government agencies and officials, analysts, and the media, and by the Ecuadorian, Canadian, Brazilian and Argentine courts by means of their acceptance of Patton Boggs's misrepresentations and omissions.

116.    As a direct, proximate, and foreseeable result of the fraud of Patton Boggs, including Patton Boggs's propagation of material misrepresentations and/or omissions, Chevron has been harmed, including significant pecuniary and other damages.  These injuries include, but are not limited to, the attorneys' fees and costs to defend itself in a corrupt and fraudulent litigation in Ecuador and in related litigation in the United States, including but not limited to the attorneys' fees and costs associated with responding to and exposing the pervasive Ecuadorian fraud through § 1782 proceedings and the attorney's fees and costs incurred responding to the LAPs' litigation tactics that were funded by Burford.  Patton Boggs's fraudulent conduct made possible the continuation of fraudulent litigation against Chevron from 2010 onward, including the foreign enforcement actions in Argentina, Brazil, and Canada, and Patton Boggs is therefore jointly and severally liable for any and all damage to Chevron flowing from the fraudulent litigation.  In addition, to the extent Patton Boggs's co-conspirators are able to enforce any part of the fraudulent Ecuadorian judgment and cause Chevron additional harm, Patton Boggs would be jointly and severally liable to Chevron as a result of Patton Boggs's fraudulent acts.

117.    Patton Boggs engaged in the above conduct maliciously, willfully, and fraudulently, and, because of the reprehensible and outrageous nature of these acts, Chevron is entitled to, and should be awarded, punitive damages against Patton Boggs.

WHEREFORE, Chevron prays for judgment as set forth below.

## SECOND COUNTERCLAIM FOR RELIEF
### (Deceit under New York Judiciary Law § 487)

118.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph as if set forth in full.

119.    Patton Boggs's deceptive conduct before the Southern District of New York and the Court of Appeals for the Second Circuit in furtherance of the scheme (paragraphs 72-91,

*supra*) violates New York Judiciary Law § 487 as it reflects both "a chronic, extreme pattern of legal delinquency" and "an intent to deceive" both of those courts. *Amalfitano v. Rosenberg*, 428 F. Supp. 2d 196, 207 (S.D.N.Y. 2006) (quoting *Trepel v. Dippold*, 2005 WL 1107010 at *4 (S.D.N.Y. May 9, 2005)).

120.    This deceptive and delinquent conduct has:  (1) directly and proximately damaged Chevron; (2) compelled Chevron to incur substantial legal fees and other expenses in order to respond to these falsehoods; (3) interfered with Chevron's attempts to resist enforcement of the fraudulent $18 billion Ecuadorian judgment; (4) obstructed and delayed proceedings in the Southern District of New York; and (5) fraudulently concealed from the Southern District of New York and the Second Circuit the fraud, corruption, and misconduct of the LAP team underlying the Ecuadorian judgment.

121.    Pursuant to N.Y. Judiciary Law § 487, Patton Boggs is obligated to "forfeit to the party so injured"—here, Chevron—"treble damages."

WHEREFORE, Chevron prays for judgment as set forth below.

### THIRD COUNTERCLAIM FOR RELIEF
**(Malicious Prosecution)**

122.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph as if set forth in full.

123.    Patton Boggs maliciously prosecuted three separate complaints against Chevron—its former client—in the District Court for the District of Columbia.  Patton Boggs initiated repeated, vexatious proceedings in that court, and on all three occasions the action terminated in Chevron's favor.

124.    Patton Boggs lacked probable cause to support its declaratory judgment and tortious interference claims before the District Court for the District of Columbia.  That court

termed Patton Boggs's allegations "wholly unsupported." *Patton Boggs I*, 791 F. Supp. 2d at 28. Patton Boggs also disregarded the district court's repeated rulings that its claims were meritless and that "Patton Boggs misunderstands the law." *Id.* at 20 (quotation marks omitted).

125.    Patton Boggs acted with malice and conscious falsity in prosecuting its claims against Chevron.  Many of Patton Boggs's baseless allegations had nothing whatsoever to do with the conflict-of-interest issue that was the ostensible subject of Patton Boggs's declaratory relief claim.  Rather, Patton Boggs's allegations against its former client were part of an overall scheme to fraudulently obtain money from Chevron.  The district court denied Patton Boggs's motion to amend and dismissed its complaint.  This was the first termination of the action in Chevron's favor.  The district court's dismissal put Patton Boggs on notice that its claims lacked merit.

126.    Undeterred, Patton Boggs filed a motion for reconsideration, and added a claim for tortious interference under § 766A of the Restatement (Second) of Torts, based on a bare one-sentence allegation.  Patton Boggs maliciously added this claim without offering facts or argument to support it.  The firm knew its claim lacked merit and was untimely, but it deceptively used the motion as a pretext to offer yet another amended complaint—its third attempt to file claims against Chevron before the district court.

127.    The district court denied Patton Boggs's motion for reconsideration and rejected the amended complaint.  It noted that "[e]ven if Patton Boggs's argument were not untimely, and even if the Court were to apply § 766A precisely as written, Patton Boggs's proposed amended complaint would still fail to state a claim for tortious interference" because it identified no "'pecuniary loss'" arising from the defendants' alleged conduct—a required element under § 766A. *Patton Boggs I*, 791 F. Supp. 2d at 31.

128.   The court also rejected Patton Boggs's request to reconsider its decision not to issue a declaratory judgment, observing that Patton Boggs continued to press "wholly unsupported" legal arguments.  *Id.* at 28.

129.   These rulings provided ample notice to Patton Boggs that its claims against Chevron lacked legal merit.  Nevertheless, Patton Boggs pressed forward with what it claimed was a new lawsuit, which presented the same claims the district court had repeatedly rejected. Accordingly, for a third time, the district court was forced to issue an opinion holding that Patton Boggs's claims were meritless and could not proceed.   In light of "Patton Boggs's acknowledge[ment] that four of its five claims are identical to those that the Court dismissed or denied leave to add" in its first opinion, the court concluded that they were barred by claim preclusion or res judicata.  *Patton Boggs II*, 825 F. Supp. 2d at 39.

130.   The district court further held that Patton Boggs's tortious-interference claim premised on the new, one-sentence allegation that the defendants had undertaken efforts to cut off the LAPs' payments to Patton Boggs failed to state a claim on which relief could be granted. The new allegation "merely rephrases the fourth element of tortious interference: 'intentional procurement of the contract's breach.'"  *Id.* at *5 (quoting *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 325 (D.C. 2008)).  Patton Boggs prosecuted these claims maliciously and without probable cause.

131.   This malicious prosecution was intended to generate adverse publicity and to harm Chevron, and it has proximately caused direct and foreseeable injury to Chevron, including but not limited to attorneys' fees and other expenses, costs associated with Chevron's steps to mitigate the intended loss of reputation and goodwill and harm to the valuable Chevron brand,

and the diversion of resources that Chevron could have used to defend itself against the enforcement of a fraudulent $18 billion Ecuadorian civil judgment.

132.    Patton Boggs and the LAPs' other attorneys are engaged in a concerted strategy to obstruct and delay the federal court proceedings in order to obtain and enforce a corrupt judgment from the Ecuadorian court as leverage to fraudulently obtain money from Chevron. The action commenced in the District of Columbia District Court was part of that ongoing and long-running effort. Patton Boggs's multiple, baseless complaints in the District of D.C. were intended to aid the LAPs in enforcing their fraudulent Ecuadorian judgment. Patton Boggs's malicious prosecution of multiple vexatious lawsuits therefore caused substantial injury to Chevron, beyond the attorneys' fees and costs inherent in combating a meritless claim.

133.    Patton Boggs has engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Chevron is entitled to, and should be awarded, punitive damages against Patton Boggs.

WHEREFORE, Chevron prays for judgment as set forth below.

## PRAYER FOR RELIEF

**On the First and Third Claims for Relief:**

1.    For compensatory damages in amounts to be proven at trial, plus legal interest.

2.    For punitive damages in the amount to be proven in trial.

**On the Second Claim for Relief:**

3.    For treble damages and Chevron's reasonable attorneys fees' pursuant to N.Y. Judiciary Law § 487.

**As to all Causes of Action:**

4.      For an award of fees, costs, and any and all other relief that the Court may deem

just and proper.                            Respectfully submitted,


By:   ___/s/ Randy M. Mastro_____

Randy M. Mastro, Esq.
Andrea E. Neuman, Esq.
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166 0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

William E. Thomson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California  90071
Telephone: 213.229.7000
Facsimile:  213.229.7520

Herbert J. Stern, Esq.
Joel M. Silverstein, Esq.
STERN & KILCULLEN, LLC
325 Columbia Turnpike
Florham Park, New Jersey  07932
Telephone:  973-535-1900
Facsimile:  973-535-9664

*Attorneys for Chevron Corporation*