**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PATTON BOGGS LLP,

         Plaintiff and Counterclaim Defendant,

      v.

CHEVRON CORPORATION,

        Defendant and Counterclaimant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 12 Civ. 9176

### CHEVRON CORPORATION'S OPPOSITION TO NON-PARTIES STEVEN DONZIGER, HUGO CAMACHO NARANJO, JAVIER PIAGUAJE PAYAGUAJE'S MOTION TO INTERVENE

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile:  212.351.4035

STERN & KILCULLEN, LLC
75 Livingston Avenue
Roseland, New Jersey 07068
Telephone: 973.535.1900
Facsimile:  973.535.9664

*Attorneys for Chevron Corporation*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................................. 1

FACTUAL BACKGROUND................................................................................................... 4

ARGUMENT ..................................................................................................................... 5

    A.    Donziger and the LAPs Do Not Have Grounds to Intervene........................................ 5

        1.    The Motion to Intervene Is Not Timely ................................................................. 5

        2.    Donziger and the LAPs Do Not Assert Any Interest Relating to the Property or Transaction That Is the Subject of the Action .................................. 7

        3.    Denial of Intervention Would Not Impair Donziger or the LAPs' Ability to Protect Their Interests ................................................................... 11

    B.    Given the History of Litigation Misconduct, the Court Should Not Permit Intervention Without First Requiring Movants to Provide Discovery......................... 12

CONCLUSION................................................................................................................. 17

# TABLE OF AUTHORITIES

**Page**

### Cases

*Beauregard, Inc. v. Sword Servs., LLC,*
    107 F.3d 351 (5th Cir.1997) ................................................. 12

*Bey v. City of New York,*
    No. 99 Civ. 3873 (LMM), 2009 WL 2033066 (S.D.N.Y. July 10, 2009) .............................. 16

*Black Rock City LLC v Pershing County Bd. of Comm'rs,*
    No. 3:12-cv-00435-RCJ-VPC, 2014 WL 40755 (D. Nev. Jan. 6, 2014) ................................ 10

*Boguslavsky v. Kaplan,*
    159 F.3d 715 (2d Cir. 1998) ................................................. 11

*Butler, Fitzgerald & Potter v. Sequa Corp.,*
    250 F.3d 171 (2d Cir. 2001) ................................................. 5

*Chevron Corp. v. Donziger,*
    Case No. 14-826, Dkt. 54 (2d Cir. May 19, 2014) ................................ 15, 16

*Crown Fin. Corp. v. Winthrop Lawrence Corp.,*
    531 F.2d 76 (2d Cir. 1976) ................................................. 1, 6

*Farmland Dairies v. Comm'r of N.Y. Dep't of Agric. & Mkts.,*
    847 F.2d 1038 (2d Cir. 1988) ................................................. 5

*Firebird Soc. of New Haven, Inc. v. New Haven Bd. of Fire Comm'rs,*
    66 F.R.D. 457 (D. Conn. 1975) ................................................. 6

*Health-Chem Corp. v. Baker,*
    737 F. Supp. 770 (S.D.N.Y. 1990), *aff'd*, 915 F.2d 805 (2d Cir. 1990) ................................ 9

*In re Sept. 11 Prop. Damage Litig.,*
    650 F.3d 145 (2d Cir. 2011) ................................................. 8

*Local 621, S.E.I.U., AFL-CIO v. City of New York,*
    No. 99 Civ. 9025, 2002 WL 31151355 (S.D.N.Y. Sept. 26, 2002) ........................ 17

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n Inc.,*
    471 F.3d 377 (2d Cir. 2006) ................................................. 6

*Metro. Opera Ass'n, Inc. v. Local 100,*
    *Hotel Emps. and Rest. Emps. Int'l Union,*
    239 F.3d 172 (2d Cir. 2001) ................................................. 11

*Miller v. Silbermann,*
    832 F. Supp.663, 670 (S.D.N.Y. 1993) ................................................. 11

*Naftchi v. N.Y. Univ. Med. Ctr.,*
    172 F.R.D. 130 (S.D.N.Y. 1997) ................................................. 17

*Polo Fashions Inc. v. B. Bowman & Co.,*
    102 F.R.D. 905 (S.D.N.Y. 1984) ................................................. 17

*Roberson v. Giuliani,*
   346 F.3d 75 (2d Cir. 2003) ........................................................................ 8, 9

*Schiller v. City of New York,*
   04 Civ. 7922 (KMK), 2006 WL 2708464 (S.D.N.Y. Sept. 20, 2006) ................................... 17

*Shore v. Parklane Hosiery Co., Inc.,*
   606 F.2d 354 (2d Cir. 1979) ........................................................................ 12

*Smyth v. Rivero,*
   282 F.3d 268 (4th Cir. 2002) ........................................................................ 8

*U.S. v. Yonkers Bd. of Educ.,*
   801 F.2d 593 (2d Cir. 1986) ........................................................................ 5, 6

*United States v. District Council of New York City,*
   No. 90 Civ. 5722(CSH), 2007 WL 2324338 (S.D.N.Y. Aug. 14, 2007) ................................ 13

*United States v. Pitney Bowes, Inc.,*
   25 F.3d 66 (2d Cir. 1994) ........................................................................ 1, 5

## Other Authorities

30C Fed. Prac. & Proc. § 7090 (2014 ed.) ........................................................ 17

## Rules

D.C. Rules of Prof'l Conduct § 1.16(b)(2) ........................................................ 10

Fed. R. Civ. P. 24 ........................................................................ 12

Fed. R. Civ. Proc. 24(a) ........................................................................ 11

Fed. R. Evid. 806 ........................................................................ 17

Model Rules of Professional Responsibility § 1.16(b)(3) ................................ 10

N.J. Rules of Prof'l Conduct 1.16(b)(3) ........................................................ 10

N.Y. Rules of Prof'l Conduct § 1.16(c)(3) ........................................................ 10

## PRELIMINARY STATEMENT

Steven Donziger and LAP Representatives Hugo Camacho Gerardo Naranjo and Javier Piaguaje Payaguaje seek to intervene "as of right" to challenge the Court's "so-ordering" of the stipulation of dismissal at the joint request of the parties to this action—Chevron Corporation and Patton Boggs LLP.  Donziger and the LAPs do not move for permissive intervention, and they do not assert any interest in the actual subject matter of the underlying litigation as reflected in the claims of Patton Boggs (which the Court dismissed on motion) or the claims of Chevron (which the Court ruled could go forward).  Instead, Donziger and the LAPs confine themselves to critiquing a few of the terms of the settlement agreement, such as Patton Boggs's "statement of regret" and its commitment to cooperate in discovery.  In fact, Donziger articulates no personal interest in any of this, apparently seeking to "intervene" just to make another press release.  But "an interest relating to the property or transaction that is the subject of the action" is a prerequisite to intervention as of right (*United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994)), and Donziger and the LAPs' failure to assert such an interest itself defeats their motion.  And even if they had asserted an interest in the underlying subject matter of the litigation, their motion to intervene to defend such an interest would be untimely, coming as it does years after the action was filed, and only after it was dismissed.  "Intervention after judgment is unusual and not often granted."  *Crown Fin. Corp. v. Winthrop Lawrence Corp.*, 531 F.2d 76 (2d Cir. 1976) (internal quotation marks and citations omitted).

While the assertion of a privilege can constitute grounds for intervention, Donziger does not allege, much less proffer evidence to show, that he has any privilege to protect.  Patton Boggs, after all, was not his counsel.  And while the LAPs attempt to make much out of a supposed threat to a privilege they may have had with Patton Boggs, much of their motion and its

supporting documentation—especially the Declaration of Pablo Fajardo—waives that privilege by putting at issue communications with Patton Boggs.  Moreover, the LAPs do not really seek to intervene to *assert* a privilege, which they claim they are too poor and lack counsel to do.  On the contrary, the LAPs argue generally that Patton Boggs's manner of withdrawal as their counsel has "prejudiced" them, and that the firm's agreement to provide discovery—after according the LAPs an opportunity to object and assert any privileges they have—is "unethical" and thus should somehow be precluded.  The essential premise of the LAPs' "intervention" motion is thus the notion that the Court must "approve" the terms of this agreement between private parties before "so ordering" dismissal.  But even if this were true, the terms of the agreement expressly provide for the only remedy that the requested "intervention" could possibly produce:  The opportunity for the LAPs to assert and adjudicate any actual, unwaived, and unvitiated privileges.

Finally, as there has been throughout Donziger and the LAPs' years of litigation in the related RICO case, the present motion contains a strong suggestion of PR-posturing and game playing, rather than a legitimate attempt to protect any real interests at issue.  There is more than a little irony in the prospect of Steven Donziger seeking to "intervene" to teach anyone about the ethical obligations of lawyers, after having devoted his career to breaching those duties and capturing the wreckage on film.  Numerous assertions in the present motion and the sworn Fajardo Declaration contradict what the LAPs and their agents—including Fajardo personally—have been saying publicly for weeks:  That Patton Boggs notified them *months ago* that they were withdrawing and that the LAPs had in fact acceded to it.  And, as always, there is the unsubstantiated LAP plea of poverty and claimed lack of counsel, even though the LAPs just retained a prominent new lawyer in the Second Circuit, other lawyers regularly do their bidding in the press, and they or their allies recently spent hundreds of thousands of dollars on a media cam-

paign to pressure Chevron's annual meeting.  While Donziger and the LAPs purport to take um-

brage at Patton Boggs's "statement of regret," that statement followed seven weeks of trial in

which Chevron's evidence was largely undisputed and issuance of this Court's devastating 500-

page opinion.  Legal commentators have noted that Patton Boggs's "statement of regret" "was

acceptable if the firm learned its services were being used to promote a crime or fraud" (Ex. 1 at

3)—crime and fraud that this Court has amply documented and affirmatively adjudicated.

       The motion's principal purveyor of "evidence," Pablo Fajardo, is a confirmed serial per-

jurer whose untested paper "testimony" on these and other topics is not worthy of this, or any,

Court's credence.  But there is a simple way to test the LAPs' "evidence" as well as the broader

bona fides of the present motion:  permit Chevron to propound discovery to the movants and de-

pose Fajardo before the Court rules on their motion.  By submitting the declaration, the LAPs

and Fajardo have waived privilege and submitted (once more) to the jurisdiction of this Court,

but there is little doubt that they will, as they have in the past, refuse to cooperate in discovery.

In fact, the Fajardo declaration itself purports to disclaim any such jurisdiction, and instead asks

the Court to advise him if he is wrong.  This, and their long history of lies and discovery eva-

sions, strongly suggests that Fajardo and Donziger and the LAPs once again have no intention of

fulfilling their legal obligations if allowed to intervene.  There is no reason to permit this.[1]

       In sum, Donziger and the LAPs have failed to satisfy the prerequisites for intervention as

of right, and their motion is a publicity stunt.  It should be denied.

---

[1]   Moreover, that Donziger appears as counsel on behalf of the LAPs further shows the falsehood of his previous assertions that he had been replaced "as the coordinator of the U.S. litigation with [] one of Fajardo's Ecuadorian subordinates."  11-Civ-0691 Dkt. 1529 at 75.  The Court properly found that Donziger's supposed evidence of this change—an email from Fajardo—was "an attempt to create a facade to hide reality and to buttress Mr. Donziger's argument that he no longer is in control rather than to portray reality."  *Id.* at 77.  Donziger's appearance here confirms the shell game that he and the LAPs have been playing with counsel all along.

## FACTUAL BACKGROUND

Patton Boggs filed this case against Chevron in the United States District Court for the District of New Jersey on February 15, 2012, seeking, among other things, to recover on the pre-liminary injunction bond Chevron had posted after this Court enjoined enforcement of the Ecua-dorian judgment in the early stages of the RICO litigation.  Dkt. 1 ¶¶ 45-48.  Chevron moved to transfer the action to this Court (Dkt. 7), and sought leave to file counterclaims (Dkt. 58), which the Court granted on March 31, 2014 (Dkt. 72).  On April 29, 2014, the Court dismissed Patton Boggs's affirmative claims against Chevron.  Dkt. 80  Then, on May 7, 2014, on the verge of the commencement of fact discovery, the parties filed a stipulated dismissal, including a so-ordered stipulation solely for the purposes of requesting that the Court retain jurisdiction to enforce the Settlement Agreement.  Dkt. 81.  The Court dismissed the action that day, "so-ordering" the par-ties' stipulation of dismissal.  Id.

The Settlement Agreement required Patton Boggs to pay Chevron $15,000,000 and as-sign its interests in the Ecuadorian judgment to Chevron.  Dkt. 81 Ex. A ¶¶ 1, 3.  It also provided that Patton Boggs would issue a public statement announcing the settlement and acknowledging that "[t]he recent opinion of the United States District Court for the Southern District of New York includes a number of factual findings that would have materially affected our firm's deci-sion to become involved and stay involved as counsel here.  Id. ¶ 8  Based on the Court's find-ings, Patton Boggs regrets its involvement in this matter."  The Agreement provided Chevron with an opportunity to take limited discovery from Patton Boggs, but also required that the LAPs be provided with notice of that discovery and an opportunity to object.  Id. ¶ 5.

On May 21, 2014, after this action was dismissed and closed, Donziger and the LAPs filed this motion seeking leave to intervene.  Dkt. 82 at 8.

4

**ARGUMENT**

Donziger and the LAPs' complaints regarding the settlement of this action do not provide them grounds to intervene.  They fail to satisfy the criteria for intervention under Rule 24(a) because their motion is untimely and they do not allege an interest in the property or transactions that are the subject of this action.  And given their history of bad faith litigation, the Court should require the moving parties to submit to deposition and document discovery before the motion is resolved.  If Donziger, the LAPs, and Fajardo are not willing to do so, the Court should recognize the instant motion as the public relations ploy that it is, and deny it.

**A.      Donziger and the LAPs Do Not Have Grounds to Intervene.**

An applicant may intervene as a matter of right only when he or she: (1) files a timely motion; (2) asserts an interest relating to the property or transaction that is the subject of the action; (3) is so situated that without intervention the disposition of the action may, as a practical matter, impair or impede its ability to protect that interest; and (4) has an interest not adequately represented by the other parties.  *Pitney Bowes*, 25 F.3d at 70.  Failure to satisfy any of these requirements warrants denial of intervention.  *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 176 (2d Cir. 2001).

**1.      The Motion to Intervene Is Not Timely**

An untimely motion to intervene should be denied.  *Farmland Dairies v. Comm'r of N.Y. Dep't of Agric. & Mkts.*, 847 F.2d 1038, 1043 (2d Cir. 1988); *United States v. Yonkers Bd. of Educ.*, 801 F.2d 593, 594 (2d Cir. 1986).  When determining whether a motion to intervene is timely, courts must consider: (a) the length of time the applicant knew or should have known of his interest before making the motion; (b) prejudice to existing parties resulting from the applicant's delay; (c) prejudice to the applicant if the motion is denied; and (d) the presence of unusu-

5

al circumstances militating for or against a finding of timeliness. *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n Inc.*, 471 F.3d 377, 390 (2d Cir. 2006).

Here, to the extent that Donziger or the LAPs have any interest in the underlying subject matter of the action, they necessarily have known of this since the action was filed more than two years ago. Patton Boggs filed this lawsuit seeking to recover on an injunction bond that Chevron posted in the RICO litigation—a bond that was intended to avoid any prejudice to the LAPs by virtue of this Court's preliminary injunction in that case. Dkt. 1 at ¶¶ 45-48; 11-Civ-0691 Dkt. 181 at 119. Moreover, when Chevron sought to assert counterclaims against Patton Boggs for fraud and deceit in May 2013, those counterclaims were based upon Patton Boggs's actions undertaken on behalf of the LAPs. Accordingly, if the LAPs possess "an interest in the property or transaction that is the subject of" this litigation, they have been aware of it for years. But they never sought to intervene until after this action was settled and the case dismissed.

Further, both Chevron and Patton Boggs would be prejudiced if Donziger and the LAPs were permitted to intervene at this stage, where the litigation has already been settled. *See Yonkers Bd. of Educ.*, 801 F.2d at 596. The parties have negotiated and reached a mutually-acceptable compromise. Reopening the litigation would not be in the interest of either party. And the LAPs will not be prejudiced by the denial of their motion, because the so-ordered Agreement provides them the opportunity to assert any privileges to post-settlement discovery. *See* Section A.3, *infra*.

Finally, absent "unusual and compelling circumstances," an application to intervene is untimely if the litigation has been concluded and judgment entered. *Firebird Soc'y of New Haven, Inc. v. New Haven Bd. of Fire Comm'rs*, 66 F.R.D. 457, 464-65 (D. Conn. 1975); *see also Crown Fin. Corp.*, 531 F.2d at 77; *Yonkers Bd. of Educ.*, 801 F.2d at 596 (holding that interven-

tion after judgment has been entered is generally disfavored because it creates delay and prejudice to existing parties and undermines the orderly administration of justice).  No such circumstances are present here.  Indeed, the only unusual circumstances present here militate against a finding of timeliness.  The motion was designed solely to gain press coverage, to claim that Patton Boggs's stated grounds for withdrawal were "unethical" and a pretext, and to influence the potential merger between Patton Boggs and Squire Sanders LLP.[2]  Indeed, many of the motion's complaints have nothing to do with the terms of the settlement, but rather with Patton Boggs's independent conduct toward its former clients.  These circumstances do not justify intervention.

### 2.     Donziger and the LAPs Do Not Assert Any Interest Relating to the Property or Transaction That Is the Subject of the Action

Donziger never explains what interest he has in this proceeding.  He does not claim to have ever been a client of Patton Boggs, and does not assert that Patton Boggs owed him any particular duty.  Accordingly, intervention should be denied as to him.

As for the LAPs, they, too, fail to assert any interest in the subject or property at issue in the underlying litigation as reflected in Patton Boggs's complaint or Chevron's counterclaims. Instead, the LAPs seek to intervene for the purposes of challenging this Court's so-ordering of the parties' stipulation of dismissal on the grounds that the settlement agreement underlying that stipulation is "unethical" and prejudices the LAPs.  They complain about the Settlement Agreement as follows:  (1) Patton Boggs violated its ethical duties by failing to notify the LAPs it was withdrawing prior to the public announcement of the settlement agreement; (2) Patton Boggs never provided the LAPs with a copy of the Settlement Agreement; (3) Patton Boggs violated its ethical duties by issuing a statement of regret, which purportedly "contradicts repeated assuranc-

---

[2]     In fact, Patton Boggs's merger partner reportedly delayed the partnership vote following the filing, though the merger has since been consummated.  *See* Ex. 2 at 1.

es by the firm's lawyers"; and (4) the discovery provisions of the Settlement Agreement violate Patton Boggs's duty of confidentiality.  Dkt. 82 at 2-3.

The LAPs argue that because the Court retained jurisdiction to enforce the terms of the Settlement Agreement by so-ordering the parties' stipulation of dismissal pursuant to Rule 41(a)(2), the Court was required to determine whether the terms of the agreement were proper and that some interest they supposedly have in this gives them standing to intervene.

The LAPs invoke cases that arise in the very different context in which courts considered whether a settlement over which the court retained jurisdiction under Rule 41(a)(2) constituted sufficient judicial sanction to convey "prevailing party" status on plaintiffs for purposes of fee-shifting statutes.  *See Roberson v. Giuliani*, 346 F.3d 75, 80, 82 (2d Cir. 2003); *Smyth v. Rivero*, 282 F.3d 268, 282 (4th Cir. 2002).  This line of cases considers the retention of jurisdiction under Rule 41(a)(2) as equivalent to a consent decree for purposes of fee-shifting.  *See Roberson*, 346 F.3d at 83.  Nothing suggests that these cases intended to, or did, radically displace the traditional rule that courts are not required to give searching, prior scrutiny to private-party settlement agreements before entry of dismissal, whenever a court is asked to retain jurisdiction to enforce the settlement agreement, as the LAPs now contend.  *See, e.g., In re Sept. 11 Prop. Damage Litig.*, 650 F.3d 145, 150 (2d Cir. 2011) ("Typically, settlement rests solely in the discretion of the parties, and the judicial system plays no role.") (internal quotation marks and citation omitted).  Indeed, in *Roberson* the district court did not "specifically review[] or approve[] the terms of the settlement agreement" while retaining jurisdiction to enforce the settlement (346 F.3d at 82), and no notice was given to the absent putative class members before so-ordering the settlement agreement between the named parties (*id.* at 78 n.2).  And in the RICO case the LAPs argued that this Court was *not* empowered to approve or disapprove the terms of the Stratus set-

tlement.  *See* 11-Civ-0691 Dkt. 960 at 5 ("this Court is without authority to grant that relief");

*see also* 11-Civ-0691 Dkt. 955 at 2 ("The Court shares the concerns of the non-settling defend-

ants as to whether it has authority to approve the terms of the proposed settlement as distin-

guished from merely approving the dismissal of the claims *inter se*. . . .").  If the *Roberson* case

has any bearing here, it suggests that the focus of any "judicial oversight of the agreement" is

most appropriately directed to any efforts to actually *enforce* particular terms of the Settlement

Agreement, because it is the retention of jurisdiction to enforce the agreement, not the scrutiny of

the agreement (in *Roberson* itself there had been none), that was found to be of significance.  346

F.3d at 83.

Indeed, the LAPs cite to cases that stand for the noncontroversial proposition that a court

may refuse to enforce a settlement agreement, like any contract, if it determines its terms are il-

legal.  *See Health-Chem Corp. v. Baker*, 737 F. Supp. 770, 775 (S.D.N.Y. 1990) (in breach of

contract action over settlement agreement, holding that fact that agreement would be more ex-

pensive than party had previously anticipated "does not render the Settlement Agreement invalid,

illegal, or unenforceable"), *aff'd*, 915 F.2d 805 (2d Cir. 1990).  But the LAPs assert no claim to

enforce the settlement agreement and most of their complaints do not relate to the terms of the

Settlement Agreement, which, for example, places no obligations on Patton Boggs as to how to

communicate withdrawal to its clients and expressly contemplates "[c]ompliance by the Patton

Boggs Releasees with their obligations to the LAPs, as former clients, under applicable law and

the Rules of Professional Conduct, with respect to transitional matters such as . . . communi-

cating with the LAPs and their designated counsel concerning the transition to successor counsel.

. . ."  Dkt. 81 Ex. A ¶ 2(b).

The only case that the LAPs cite in which a court addresses the enforceability of a settle-
ment agreement by declining to enter a stipulation of dismissal does not hold that a court is re-
quired to determine whether the agreement is enforceable in dismissing a case, and reflects cir-
cumstances very different than those here.  *See Black Rock City LLC v Pershing County Bd. of
Comm'rs*, No. 3:12-cv-00435-RCJ-VPC, 2014 WL 40755, at *12 (D. Nev. Jan. 6, 2014) (declin-
ing to retain jurisdiction over settlement agreement because it was "illegal and unenforceable,
and [] the product of an abuse of judicial process and a fraud committed on this Court").  In
*Black Rock City*, the court declared illegal and unenforceable a settlement between the Burning
Man festival and Pershing County that permitted the festival to remain in that county.  *Id*.  At the
hearing on the proposed settlement, the judge reportedly stated that he would file bar complaints
against all the lawyers involved, laughed at and mocked the attorneys, suggested that they "go
back to law school," and called a U.S. marshal when one of the lawyers tried to complete a sen-
tence.  Ex. 3 at 2-4.  Whatever this case (an outlier) stands for, it is not binding on this Court and
it does not stand for the proposition that courts must broadly "approve" the terms of private party
settlement agreements as though they were all class actions.

As for the LAPs' complaint about the Patton Boggs "statement of regret," a law firm has
the right to withdraw from a representation when it is in furtherance of a crime or fraud.  *See,
e.g.*, Model Rules of Prof'l Responsibility § 1.16(b)(3); N.J. Rules of Prof'l Conduct §
1.16(b)(3); N.Y. Rules of Prof'l Conduct § 1.16(c)(3); D.C. Rules of Prof'l Conduct § 1.16(b)(2).
As independent commentators have noted, Patton Boggs's public statement of regret "was ac-
ceptable if the firm learned its services were being used to promote a crime or fraud."  Ex. 1 at 3.
This Court has already adjudicated the crimes and frauds of Donziger, the LAPs, and their
agents, including Pablo Fajardo, and those findings are not only amply supported with evidence

but collaterally estop Donziger and the LAPs from challenging them here.  *Boguslavsky v. Kaplan*, 159 F.3d 715, 719-20 (2d Cir. 1998).  In addition, Patton Boggs has already made its statement, and Donziger and the LAPs cannot contend that this Court could compel Patton Boggs to engage in contrary speech.  *See, e.g.*, *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. and Rest. Emps. Int'l Union*, 239 F.3d 172, 176 (2d Cir. 2001).

Regarding the discovery permitted by the Settlement Agreement, the agreement provides that all post-settlement discovery will be "subject to all applicable Rules of Professional Conduct" and that "the LAPs shall be afforded an opportunity to assert any privilege or work product protection that may attach to any information sought to be discovered."  Dkt. 81 Ex. A ¶ 5(c).  The LAPs cannot colorably object to this.

Finally, the LAPs' interest in protecting their privileged communications does not relate to the property or transactions that are the subject matter of this litigation or otherwise provide them with a proper ground to intervene here.  The LAPs do not seek to intervene to gain the opportunity to actually assert privilege objections to the discovery, because, as they recognize, that opportunity is already accorded them under the terms of the so-ordered Settlement Agreement and order of dismissal.  *See* id.  As such, there is no basis for intervention.

### 3.    Denial of Intervention Would Not Impair Donziger or the LAPs' Ability to Protect Their Interests

Donziger and the LAPs must also demonstrate that "disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Fed. R. Civ. P. 24(a).  The court must consider the degree to which the applicant may be "practically harmed."  *Miller v. Silbermann*, 832 F. Supp. 663, 670 (S.D.N.Y. 1993).  The LAPs' expressed interest in protecting their potentially privileged communications from discovery is already protected by the terms of the Settlement

Agreement.  Dkt. 81 Ex. A ¶ 5(c).  While they claim that "the indigent affected clients no longer even have counsel effectively capable to make such privilege assertions" (Dkt. 82 at 10), the present motion itself belies this.  And the only support offered is the Fajardo Declaration, which contradicts his contemporaneous public statements.  *See infra*, Section B.  In any event, the LAPs are represented by multiple law firms and law professors in their appeal of the RICO action and in other U.S. litigation, and Donziger is a Harvard Law-educated attorney who is presumably able to make privilege objections.  *See id*.

### B.   Given the History of Litigation Misconduct, the Court Should Not Permit Intervention Without First Requiring Movants to Provide Discovery

Prior to ruling on the present motion, the Court should permit Chevron to take discovery of the moving parties, including declarant Pablo Fajardo.  It is well settled that a court may impose conditions upon parties seeking intervention as of right.  As the Advisory Committee Note to the 1966 amendment provides, "An intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings."  Fed. R. Civ. P. 24 advisory committee's note.  The Advisory Committee's statement "was not an innovative suggestion but was instead the recognition of a well-established practice."  *Shore v. Parklane Hosiery Co., Inc.*, 606 F.2d 354, 356–57 (2d Cir. 1979); *see also Beauregard, Inc. v. Sword Servs., LLC,* 107 F.3d 351, 352–53 (5th Cir. 1997) ("[I]t is now a firmly established principle that reasonable conditions may be imposed even upon one who intervenes as of right.").

Virtually the only factual support for the motion is the Fajardo Declaration, which waives privilege, contradicts many of Fajardo's recent public statements, and appears to continue his longstanding history of perjury.  The LAPs and Donziger once again seek to use Fajardo "testimony" as both a sword and a shield, putting him forward to offer "evidence" without making

him available for deposition.  Fajardo purports to reserve any objections to jurisdiction, and requests that "[i]f the Court believes that this request for intervention materially changes in any respect the jurisdictional status of me or my clients with respect to this federal district, [it] promptly inform me of the same to allow me the opportunity to consider the consequences of this Declaration under the rules of the United States legal system, with which I am not familiar." Dkt. 82-1 ¶ 2.  Given this, there is no reason to credit the declaration absent prior discovery.

In *United States v. District Council of New York City*, another judge of this Court considered whether discovery should be permitted into assertions made in declarations by intervenors. No. 90 Civ. 5722(CSH), 2007 WL 2324338, at *6, *7 (S.D.N.Y. Aug. 14, 2007).  There, the court was considering the appropriate remedy for the defendant's violation of a consent decree, and the government sought remedies that, if granted, would impact collective bargaining agreements entered into between the defendant and the intervenors.  *Id.* at *1.  The court noted that certain assertions in the intervenors' declarations were "surprising," and that such assertions were a "legitimate subject for discovery by the government."  *Id.* at *7.  That the intervenors had submitted "sworn" statements did not eliminate the government's entitlement to discovery, because "the discovery rules do not recognize litigation by *ipse dixit*."  *Id.* at *8.  Here, the assertions in the Fajardo Declaration are more than "surprising"—they contradict his own, repeated statements.

Fajardo claims that Patton Boggs failed to communicate its withdrawal to the LAPs, which he alleges the LAPs only discovered when the Settlement Agreement was announced. Dkt. 82-1 ¶ 8.  Fajardo also asserts that the LAPs lack the resources to hire counsel to participate in post-settlement discovery, rendering the protections provided in the discovery provisions of the Settlement Agreement meaningless. Id. ¶ 15.  But immediately following the filing of the

13

Settlement Agreement on May 7, 2014, Fajardo made several public statements that contradict these statements.  In an interview given the same day the Settlement Agreement was filed, Fajardo told an Ecuadorian television station that Patton Boggs "hasn't worked on the case for the past five months . . . .  Tell me, how does that affect our case?"  Ex. 4 at 2.  Two days later, Fajardo told an Ecuadorian radio station that "[a]t the end of, uh, 2013, our lawyers at Patton Boggs in the United States called us and asked me to grant our full authorization for them to withdraw from the case," and that "we can't stop anyone, so without question we authorize you to withdraw from the case.  That's why this year, in 2014, they did not work on the case at all anymore."  Ex. 5 at 2.  He also told an Ecuadorian newspaper that the Patton Boggs settlement agreement "[was]n't a setback for the plaintiffs because the relationship with the firm ended in December 2013," and again repeated that Patton Boggs had requested that the LAPs authorize their withdrawal from the representation in December 2013, and that "[w]e authorized it."  Ex. 6 at 1.

Fajardo also claims in his May 20 declaration that "[m]y clients are entirely unable to object to any of the discovery provisions under the procedures set up by the agreement because they do not now have U.S. counsel capable of doing so, given that Patton Boggs has withdrawn its representation."  Dkt. 82-1 ¶ 15.  But this purported lack of counsel is belied by his recent statements as well as the LAPs actions in the U.S. and their continued pursuit of foreign enforcement actions.  Fajardo stated in the May 9 newspaper interview, "[T]he case in the U.S., is moving forward without any problems.  We have our own team of attorneys who are pursuing the appeal with the Second Circuit", and that "[i]n January, we hired a new group of attorneys who have taken over representation of the victims in the U.S.  There's no setback, no difficulty, no vacuum."  Ex. 6.  Indeed, although the LAPs' counsel Julio Gomez recently withdrew from

representation of the LAPs in the RICO proceeding, he was replaced even before withdrawal by Burt Neuborne, a prominent law professor from New York University School of Law. *Chevron Corp. v. Donziger*, Case No. 14-826, Dkt. 54 (2d Cir. May 19, 2014).  Aaron Page and Christopher Gowen also purport to represent Donziger and the LAPs in the RICO proceeding.  In the RICO appeal, Donziger is represented by Gupta Beck PLLC, Littlepage Booth, Friedman Rubin, and two law professors from the Sturm College of Law at the University of Denver.  Donziger and the LAPs provide no explanation for why none of these lawyers, nor Donziger himself, is able to provide the necessary services.

Fajardo's statements about lack of resources are also contradicted by the actions of the LAPs and their supporters.  In the May 9 interview, for example, Fajardo detailed how the LAPs would continue to pursue enforcement actions in Canada, Brazil, and Argentina.  Ex. 5 at 6.  The LAPs have retained enforcement counsel in each of these countries, and there is no indication that any of those firms are seeking to withdraw.  *Id*.  And since the RICO verdict was issued on March 4, 2014, the LAPs' representatives have stated their intention to file even more enforcement actions.  Ex. 7. at 5 (Luis Yanza stating intention to file enforcement actions in Venezuela and Colombia).  In their recent statement to Chevron shareholders, the LAPs' representatives vowed, "We will hold on for as long as it takes, we will follow Chevron into any and all countries where it holds assets. . . .  In other words: please be aware that your investment in Chevron will never be safe.  Sooner or later, we will collect what the company owes us in one or more countries, and you will unfortunately watch how your interests evaporate, all because of the inadequate manner in which Mr. Watson managed this conflict."  Ex. 8.

And the LAP team has continued to expend substantial sums on the pressure campaign.  Journalists recently reported that organizers aligned with the LAPs were offering $85 a day to

"extras" to come and pose as protestors at Chevron's annual meeting in Midland, Texas.  Ex. 9 at 1; Ex. 10 at 1.  Journalists also reported that a "nonprofit environmental group" working in support of the LAPs spent $200,000 to promote an "#AskChevron" hashtag campaign on Twitter intended to pressure Chevron.  Ex. 11 at 1.

This Court has already determined that Fajardo's previous declaration that purported to explain the Cabrera Report was "highly misleading," and that submission of that declaration to U.S. courts constituted obstruction of justice.  *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 462, 593-94 (S.D.N.Y. 2014).  The Court found that Donziger and the LAPs lawyers decided that "Fajardo rather than Donziger should sign it for fear that Donziger, a U.S. resident and thus subject to compulsory process, would be deposed."  *Id*. at 593-94.[3]  Thus, even aside from the inconsistencies in the latest declaration, there is ample reason not to accept another Fajardo Declaration without prior testing in discovery.  Courts have held that affidavit evidence may be stricken or not relied on where the witness is not made available to the other party for deposition. *See, e.g.*, *Bey v. City of New York*, No. 99 Civ. 3873 (LMM), 2009 WL 2033066, at *3 (S.D.N.Y.

---

[3]  Fajardo's wrongful interference with and manipulation of lawful U.S. discovery proceedings goes beyond the Fajardo Declaration about the Cabrera fraud.  Fajardo was also responsible for engineering the "collusive and clandestine" *Córdova* action in Ecuador, in an effort to frustrate Chevron's discovery in the RICO litigation.  11-Civ-0691 Dkt. 1529 at 84-87.  After Chevron had sought discovery of the LAP team's documents in Ecuador, Fajardo secretly arranged for one of the non-appearing LAPs to sue him and seek an injunction forbidding the disclosure of any documents.  *Id*.  Fajardo had repeatedly told the LAPs' U.S. counsel that he would not turn over any documents in response to Chevron's discovery requests.  However, in an apparent effort to manufacture standing, he perjured himself in the Ecuadorian proceedings and stated that "faced with the strong pressure to which we, the attorneys and social leaders, have been subjected in this lawsuit, and in view of an increasing threats, even to punish our attorneys in the United States, we have discussed this matter and *decided to turn over the information Chevron is demanding*." *Id*. at 85-86 (emphasis in original).  As this Court held, the *Córdova* lawsuit was a "collusive and clandestine attempt by the LAPs' Ecuadorian and U.S. attorneys to keep the documents in Ecuador from being produced and to do so without permitting Chevron from even attempting to contest the case before it was decided."  *Id*. at 87.  And Fajardo refused to appear at his depositions in both the Count 9 and the RICO action.  Exs. 12, 13.  Despite the Ecuadorian court's order that he not turn over any information to anyone, he nonetheless produced numerous documents to the LAPs for their use at trial—leading this Court to conclude that Fajardo has "produced documents when it has been helpful to [defendants] in this Court and refused when it has not."  11-Civ-0691 Dkt. 1529 at 93.  Fajardo even engineered the testimony of certain witnesses for defendants in the RICO trial, instructing Donald Moncayo and Humberto Piaguaje to testify in the RICO litigation while refusing to appear himself.  Ex. 14 at 2076:10-12, 2087:6-9; Ex. 15 at 2704:6-8.

July 10, 2009) (striking declarations from witnesses who could not be deposed pursuant to a prior protective order in the case and noting that "Plaintiffs have not had any opportunity to test these assertions; it is therefore unfair for Defendants to use these declarations in support of the summary judgment motion before the Court").[4]  The Court should do so here.

## CONCLUSION

Chevron respectfully requests that the Court deny Donziger and the LAPs' motion to intervene.  In the alternative, this Court should require the moving parties and Pablo Fajardo to produce documents and submit to a deposition before deciding the motion.

Dated:  June 9, 2014

Respectfully submitted,

By:  ____/s/ Randy M. Mastro_____

Randy M. Mastro, Esq.
Andrea E. Neuman, Esq.
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile:  212.351.4035

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile:  213.229.7520

---

[4]  *See also Schiller v. City of New York,* 04 Civ. 7922 (KMK), 2006 WL 2708464, at *3 (S.D.N.Y. Sept. 20, 2006) (precluding witness from offering affidavit in support of summary judgment or testimony at trial where witness was not made available for deposition, as "fundamentally unfair"); *Local 621, S.E.I.U., AFL-CIO v. City of New York,*  No. 99 Civ. 9025, 2002 WL 31151355, at *18 (S.D.N.Y. Sept. 26, 2002) (striking witness's affidavit offered in support of summary judgment where witness not made available for deposition); *Naftchi v. N.Y. Univ. Med. Ctr.,* 172 F.R.D. 130, 132 (S.D.N.Y. 1997) (Kaplan, J.) (denying protective order barring a deposition because "the party seeking the discovery is entitled to test the [witnesses'] assert[ions]"); *Polo Fashions Inc. v. B. Bowman & Co.,* 102 F.R.D. 905, 909 (S.D.N.Y. 1984) ("To permit the declaration and affidavit to be received into the hearing record now would deny the defendants the opportunity to cross-examine the declarant and to object to exhibits—something to which they are entitled as a matter of due process."). *Cf.* Fed. R. Evid. 806 (party against whom an out-of-court statement has been admitted may examine the declarant as if under cross-examination); 30C Fed. Prac. & Proc. § 7090 (2014 ed.) ("The last sentence of Rule 806 allows a party against whom an out of court statement has been admitted to call the declarant and examine him as if under cross-examination.").

Herbert J. Stern, Esq.
STERN & KILCULLEN, LLC
75 Livingston Avenue
Roseland, New Jersey 07068
Telephone: 973.535.1900
Facsimile:  973.535.9664
*Attorneys for Chevron Corporation*